## COTTRILL & *al.* vs. MYRICK.

Whether it is competent for the legislature to provide for the removal of natural obstructions, or for the erection of artificial facilities in the bed of a stream, for the ascent of fish and the creation of a fishery, where they could not otherwise pass, without the consent of the riparian proprietor, and without making compensation to him, *quære.*

But streams in which alewives and certain other fish have been *accustomed to ascend,* are subject to the regulation of the legislature. No individual can *prescribe* against this right, which is held to belong to the public.

The opinions of persons, accustomed to witness the agility and power of certain fish, in overcoming obstructions in the ascent of rivers, and who have acquired from observation superior knowledge upon that subject, are admissible in evidence, to show that a stream, in its natural state, would or would not be ascendible by such fish.

The assent of an individual to an appropriation by law of his property to public uses, without making him compensation, may be proved by *parol ;* or may be *implied* from a long acquiesence.

If public purposes and uses are to be promoted, it is no objection to the power of appropriation of private property by the legislature, that it contributes also to the emolument and advantage of individuals or corporations.

The act of the legislature of 1807, granting the emoluments arising from the fisheries in *Damariscotta river,* to the towns of *Newcastle* and *Nobleborough,* and authorising them to choose a committee with power by themselves, or any other person employed under them, " to keep open a sluice or passage way for the fish, and to go on, over, or through any land, or through any mill, or wheresoever it should be necessary for the *purposes of the Act,* without being considered as trespassers," was held to be no violation of the constitution.

Where, in trespass, the defendant justified as a town officer, and the record of the proceedings of the meeting at which he was chosen, shew that the constable, in his return of the warrant for calling the meeting, stated, that pursuant to the warrant, he had notified the inhabitatants, &c. without stating *how ;* the defect was held to be insufficient to deprive the defendant of the protection under which he justified.

Such record was held to be sufficient for the purpose of the defendant's justification, it appearing that the individual making up and certifying to it, was a clerk *de facto,* acting in the discharge of the duties of that office.

If it was necessary for such officer to be sworn, although not required by the Act under which he was chosen, *parol* proof of the taking the oath held to be sufficient.

THIS was an action of trespass, for breaking and entering the plaintiffs' close, treading down the grass, and breaking and destroying a dam on the premises, belonging to the plaintiffs.

Cottrill & al. *v.* Myrick.

The general issue was pleaded and joined ; and the defendant also filed a brief statement, setting forth a right to do the acts complained of, as one of a committee of the town of *Newcastle,* authorised by sundry statutes, referred to in said brief statement, to open a passage for alewives and other fish, through *New river* stream, a branch of the *Damariscotta* river, into *Damariscotta* pond, &c.

The facts were collected and reported by *Ebenezer Everett, Esq.*, who had been agreed on by the parties, for that purpose, and were very voluminous. In consequence, however, of the concise and clear statement contained in the opinion of the Court, the present report is much abbreviated.

The Acts of the legislature of *Massachusetts,* under which the defendant justified, were as follows : An act to regulate the fishery in *Damariscotta* river, in the county of *Lincoln*," passed *June* 20, 1807.

" An act in addition to and amendment of an act entitled an act to regulate the Fishery in *Damariscotta* river," passed *March* 5, 1810.

" An act to regulate the Fishery in *Damariscotta* river, passed *February* 15, 1816.

Another, with the same title, passed *February* 28, 1821.

" An act for the preservation of the Fish called Salmon, Shad, and Alewives, in the rivers, streams and waters within the counties of *Lincoln* and *Cumberland*," passed *March* 1, 1798.

These several statutes, as their titles import, were for the regulation of the Fishery, particularly in the *Damariscotta* stream, and, except the last, were objected to by the plaintiff as unconstitutional. Those parts however, to which the attention of counsel was more particularly directed, were the 1st and 8th sections of the Act of 1807. By these two sections, the emoluments arising from the fisheries were granted to the towns of *Newcastle* and *Nobleboro.*' ; and they were also authorised to choose a committee with power by themselves, or any other person employed under them, " to go on, over, or through any land, " or through any mill, or wheresoever it should be necessary for " the purposes of the Act, without being considered as trespas- " sers."

The defendant, as one of said committee, did no more than the Act authorised, removing a sufficient portion of the dam, to enable the fish to ascend the stream.

The character of this stream, and a brief abstract of a mass of testimony in relation to it, and the Fisheries, will be found in the opinion of the Court.

The land bordering upon this stream was *originally owned by James Kavanagh* and *Matthew Cottrill,* under whom the plaintiffs claimed ; and said stream not being navigable, was claimed by the plaintiffs to be their private property, including the fisheries, and not subject to the control of the legislature. There was also traditionary evidence of the existence of mills upon said stream, where the plaintiffs' mills now stand, prior to the year 1740.

It appeared that, in 1806, *John Borland* and others, petitioned the legislature to grant to the town of *Nobleboro'* the sole and exclusive right to take the fish in this stream, in consideration of certain expenditures which that town proposed to make, to facilitate the passage of the fish.

Against this petition, said *Kavanagh* and *Cottrill* and the town of *Newcastle,* remonstrated. But to the act of 1807, which resulted from the petition of *Borland* and others, *Kavanagh* and *Cottrill* assented — their assent being proved by *parol,* though objected to by the defendant.

The regularity of the proceedings of the town of *Newcastle,* or rather of the record of proceedings was questioned by the plaintiffs' counsel, as affecting the official character of the defendant. For the year 1830, in which the trespass was alleged to have been committed, there appeared to have been no certificate at the original making up of the record, of an oath having been administered to the town Clerk ; but *this* omission was subsequently supplied by an *amendment* of the clerk, who also testified that such amendment was according to the truth, and that he was in fact sworn by *Daniel Walters, Esq.,* a justice of the peace, in open town meeting.

He further testified that he was first chosen clerk of the town of *Newcastle,* in 1829, and had been re-elected every year since.

The records shew the election of the defendant, and two others as the fish committee for that year, but contained no certifi

cate of their having been sworn. Whereupon the clerk was called, and testified that said committee were sworn in open town meeting by *Daniel Waters, Esq*.

The counsel for the plaintiffs denied the power of the clerk to alter his records in the manner stated — and insisted on the incompetency of *parol* evidence, of the clerk and fish committee having been sworn.

Several other objections were taken to the records both of *Nobleboro'* and *Newcastle*, of a like character with the foregoing.

The sufficiency of the return of the constable on the warrant, issued for the calling of the town meeting at which the defendant was elected one of the fish committee, was also objected to, inasmuch as it stated that the inhabitants had been notified, &c. without stating *the manner* in which it had been done.

The case was very elaborately argued in writing by *Fessenden*, for the plaintiffs, and *Sprague*, for the defendant. A brief abstract only is reported of that portion of the arguments which bears upon the points decided by the Court.

*Fessenden*, for the plaintiff.

1. All the acts upon which the defendant relies for his justification, except that of *March* 1, 1798, are unconstitutional and void. That act, it is contended, confers no such power as is claimed under it, but if it can be so construed by the Court, then it is insisted that this act is also unconstitutional and void.

1. They are a violation of the constitution of the *U. States*, *Art.* 1, § 10, by which a state is restrained from passing any law impairing the obligation of contracts. The counsel here adverted to the nature of the plaintiffs' title, the deeds, covenants and contracts under which they held, the terms of the acts of the legislature, and the powers which they conferred, and argued at length in support of the position taken, citing *Sergeant's Con. Law*, 359 ; *Fletcher* v. *Peck*, 6 *Cranch*, 135; *Town of Pawlet* v. *Clark*, 9 *Cranch*, 535 ; *Vanhorne's Lessee* v. *Dorame*, 2 *Dallas*, 304.

These Acts also violate the constitution of *Massachusetts*. The 10th *Art.* of the bill of rights provides, that each individual has a right to be protected in the enjoyment of his life, liberty

and property, according to standing laws. — And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor. Now how can it be affirmed with any show of truth or reason, that *Kavanagh* and *Cottrill*, have been protected in their property? Instead of protection they have been despoiled of it to enrich the towns of *Nobleboro'* and *Newcastle.* They are not only stripped of a property of great value which they had in the fisheries, but they are greatly restricted in the enjoyment of what is left to them.

These Acts granting and regulating this fishery, violate the article of the Constitution referred to, on two grounds. First, by the acts, the property of one individual is taken and given to other individuals, which the legislature has no right to do, even paying a compensation. Secondly, the property of individuals is taken without compensation. And without an adequate compensation to be settled by the verdict of a jury, the property of an individual cannot be taken for purposes strictly public. *Perry* v. *Wilson,* 7 *Mass.* 393; *Stevens* v. *The Proprietors of Middlesex Canal,* 12 *Mass.* 446; 1 *Kent's Com.* 451; *Bowman* v. *Middleton,* 1 *Bay's Rep.* 352.

The 10th article in the Bill of Rights, which authorises the appropriation of private property for public uses, on paying a reasonable compensation therefor, by implication, prohibits such an appropriation for any private use, or the use of any individual, or number of individuals or corporation. *Little* v. *Frost,* 3 *Mass.* 106; *Proprietors Kennebec Purchase* v. *Laboree,* 2 *Greenl.* 290; *The Inhabitants of the County of Hampshire* v. *The Inhabitants of the County of Franklin,* 16 *Mass.* 76; *The Inhabitants of Medford* v. *Larned,* 16 *Mass.* 215.

Is the case varied by any power which the legislature possesses to regulate and control the fisheries? We contend not. The power of the legislature, in this respect, is limited *by the common law* in this country, to *navigable waters.* Though it is not pretended that navigable waters here, as in *England,* are only considered such where *the tide ebbs and flows.* If the fact that fish pass and repass in a stream, in all cases give a power to the legislature to control such stream, there will hardly be found a

brook which irrigates a farm, that may not be obnoxious to the exercise of such a power. *Commonwealth* v. *Chapin*, 5 *Pick.* 199.

A stream, not navigable by ships, boats, &c. may by long public *use*, obtain the character of a public highway for the transportation of lumber ; but the control of the legislature will be confined to this. It cannot give the public the right of soil in the bed of the river, or a right to take any thing from the river, in opposition to the rights of the riparian proprietor. He still continues the owner to the thread of the river. *Spring* v. *Russel & als.* 7 *Greenl.* 273 ; 3 *Kent's Com.* 411 ; *Berry* v. *Carle*, 3 *Greenl.* 269 ; *The People* v. *Platt*, 17 *Johns.* 195 ; *Angel on Water Courses, App.* 151.

A stream may also acquire a character other than that of a navigable stream, or a public highway, viz.: *a passage way for fish.* But this is acquired by the fact, *that fish have been accustomed to pass and repass up and down such stream,* and this alone forms the basis of all *constitutional* legislative enactments, regulating fisheries in streams which are private property.

The counsel here went into a particular examination of the history of legislation upon this subject, insisting that it supported fully the position taken, citing and commenting upon a great number of special statutes, and the following adjudged cases : *Randolph* v. *Braintree*, 4 *Mass.* 315 ; *Stoughton* v. *Baker*, 4 *Mass.* 522 ; *Nickerson* v. *Brackett*, 10 *Mass.* 212 ; *Commonwealth* v. *McCurdy*, 5 *Mass.* 324 ; *Commonwealth* v. *Ruggles*, 10 *Mass* 391 ; *Borden* v. *Crocker*, 10 *Pick.* 383 ; *Coolidge & al.* v. *Williams*, 4 *Mass.* 140.

The law of 1807 was passed in opposition to the remonstrance of *Kavanagh* and *Cottrill*, and any evidence of declarations by them, favorable to such a law, either prior or subsequent to the passage of it, was improperly admitted. Nor is the law any the less unconstitutional because *Kavanagh* and *Cottrill* did not, at the time, know, or consider it to be so. It is not a case where, through ignorance or misapprehension, their rights were, or could be compromitted and lost. For if the law was unconstitutional, it was merely void, and no acquiescence on their part could give

vitality to that which was merely a dead letter. *Bowman & al.* v. *Middleton*, 1 *Bay*, 252; 2 *Dallas*, 304; 1 *Kent's Com.* 451.

Again, where there is a mixed possession, the legal seisin is according to the title. *Codman & al.* v. *Winslow*, 10 *Mass.* 146; *Commonwealth* v. *Dudley*, 10 *Mass.* 403; *Norcross* v. *Widgery*, 2 *Mass.* 506.

The inhabitants of *Nobleboro'* and *Newcastle* could not, *under the statute of* 1807, disseise the plaintiffs. For as the commonwealth cannot be disseised, so it can commit no disseisin. *Tinkham* v. *Arnold*, 3 *Greenl.* 120, and the cases last above cited.

Again, an entry by the consent of the owner, cannot amount to a disseisin of the owner. *Porter* v. *Hill*, 9 *Mass.* 34.

The counsel for the plaintiffs, further insisted on the irregularity of the proceedings of the town of *Nobleboro'* and *Newcastle*, and the insufficiency of the records, — that it was not competent for them to make the alterations in the records which were made — to supply a new certificate of the administration of an oath, years after the transaction — to the *parol* proof of the fish committee's being sworn — and to the return of the constable of the warrant for town meeting in 1830. *Tuttle* v. *Carey*, 7 *Greenl.* 426.

*Sprague*, for the defendant, argued in support of the positions adopted in the opinion of the Court, citing the following authorities: *Ricker* v. *Kelly*, 1 *Greenl.* 117; *Davenport* v. *Mason*, 15 *Mass.* 92; *Lessee of Bellington* v. *Welsh*, 5 *Bin.* 131; 4 *Serg. & Rawle*, 241; *Boyd's Lessee* v. *Graves*, 5 *Wheat.* 513; *Spring* v. *Russell & als.* 7 *Greenl.* 273; *Commonwealth* v. *Breed*, 4 *Pick.* 460; *Clement* v. *Durgin*, 5 *Greenl.* 9; 8 *Wendell*, 85; *Noyes* v. *Chapin*, 6 *Wendell*, 461; *Charles River Bridge* v. *Warren Bridge*, 7 *Pick.* 531; *Vanderlitt* v. *Adams*, 7 *Cowan*, 349; *Coates* v. *The Mayor of New York*, 7 *Cowan*, 585; 12 *Wheat.* 19; *Winter* v. *Brockwell*, 8 *East*, 309; *Cook* v. *Stearns*, 11 *Mass.* 533; 14 *Serg. & Rawle*, 267; *Francis* v. *Boston & Roxbury Mill Corporation*, 4 *Pick.* 268; *Perry* v. *Wilson*, 7 *Mass.* 393; 2 *Serg. & Rawle*, 354; 14 *Serg. & Rawle*, 356; 1 *Stark. Ev.* 54; *Phill. Ev.* 226; 2 *Stark. Rep.* 258; 1 *Holt's N. P. Rep.* 283; *Davis* v. *Mason*, 4 *Pick.* 156;

*Stoughton* v. *Baker & al.*, 4 *Mass.* 522; *Vinton* v. *Welsh*, 9 *Pick.* 87; *Ingraham* v. *Wilkinson*, 4 *Pick.* 271; *Nickerson* v. *Brackett*, 10 *Mass.* 212; *Hooper* v. *Cummings*, 20 *Johns.* 90; *Cates* v. *Wadley*, 1 *McCord*, 580; *Callender* v. *Marsh*, 1 *Pick.* 418; *Thurston* v. *Hancock*, 12 *Mass.* 220; *Jackson* v. *Wright*, 4 *Johns.* 78; *Welles & al.* v. *Battelle & al.*, 11 *Mass.* 477; *Thayer* v. *Stearns*, 1 *Pick.* 109; 9 *Mass.* 312; *Sumner* v. *Tileston*, 7 *Pick.* 198.

WESTON C. J. at a subsequent term, delivered the opinion of the Court.

The defendant justifies the act complained of, under certain statutes of the *commonwealth of Massachusetts* and of *Maine.* These, it is insisted by the counsel for the plaintiffs, afford him no protection, inasmuch as they are alleged to transcend the constitutional power confided to the legislature.

By the common law in *England*, fisheries in streams not navigable, belong to the riparian proprietor. In *Massachusetts*, from its earliest settlement, this principle has been modified. It was deemed most conducive to the public good, to subject the salmon, shad and alewive fisheries to public control, whenever the legislature thought proper to interpose. They were much relied upon, as among the means of subsistence, afforded by the common bounty of Providence, and some regulation became necessary for their preservation. Our ancestors were understood to have brought with them such parts of the common law, as were applicable to their circumstances, claiming, however, and exercising the right, through every period of their history, to change or qualify it. It was competent for the Colony, Province, or *Commonwealth of Massachusetts*, having a legislature of its own, to appropriate to private use, that which was held in common in the mother country, or to provide, that what is there private proprerty, should here be enjoyed in common.

In *Massachusetts*, then, by common consent, manifested by legislative acts, and by general acquiescence, the common law rights of the riparian proprietor, yielded to the paramount claims of the public. It was implied in all grants of land, made by them, and in all conveyances by individuals, upon streams through which

these fish passed, to cast their spawn. The right of the public to regulate the interior fisheries, is proved both by legislative acts, referred to in the argument, and by judicial construction. *Stoughton et als.* v. *Baker et al.* 4 *Mass.* 522; *Nickerson* v. *Bracket,* 10 *Mass.* 212; *Ingraham* v. *Wilkinson,* 4 *Pick.* 278; *Vinton et al.* v. *Welsh,* 9 *Pick.* 87.

It is urged that the legislature had no right to interfere, except in those streams, where these fish had been used and accustomed to pass. And the acts bearing upon this subject have been examined, and the state of the rivers and streams, upon which they were intended to operate, have been adverted to, with a view to establish this position. There could be no call for legislative regulation or enactment, except upon such streams, as were so situated as to invite the ascent of these fish, and into and through which from their nature and habits, they were accustomed to pass. Whether it is competent for the legislature to provide for the removal of natural obstructions, or for the erection of artificial facilities, in the bed of a steam, without the consent of the owner of the soil, and without providing a compensation for him, for the ascent of fish, and the creation of a fishery, where they could not otherwise pass, is a question, which we are not required in the case before us, to decide.

The *Damariscotta* river, a portion of which is under consideration, is fed by fresh ponds at its source, and after running a few miles, empties into the sea. There can be no doubt but alewives, by their instinct and habits, would ascend this stream, unless impeded by obstacles, which they could not surmount. Of this, the present state of the fishery there furnishes abundant proof. It is, however, said, that this favorite and inviting resort for this. species of fish, was created by the act of 1807, and that it never was, or could be, enjoyed before.

The case finds, that for forty years anterior to that period, as far back as the memory of living witnesses extends, alewives did not ascend this stream to the ponds. It further appears, that during all that time, there existed artificial obstructions, impeding their ascent. The commissioner, who disclaims for himself, any knowledge, from observation, of their power to overcome obstacles, finds in the stream, natural impediments, which, in his

judgment, they could not have surmounted. But upon this point, although objected to by the counsel for the plaintiffs, he received the opinions of witnesses, who had noticed their agility and power ; and if this species of testimony is admissible, he regards it as proved, that these fish might, and did ascend the stream, prior to the erection of dams, or other artificial obstructions thereon. We hold this testimony to have been legally admissible. The witnesses had acquired from observation, superior knowledge upon this subject. It appears to us to fall within that class of cases, in which the opinions of persons, skilled in any art, science, trade or business, are received in evidence. 1 *Starkie*, 74 ; *Phillips*, 226, and the cases there cited.

If then, at a former period, alewives were accustomed to ascend this stream, it was like others, which they frequented, subject to the regulation of the legislature. It is a power, which they exercise at discretion, at such times as they deem expedient. Statutes of this class generally provide for a passage through artificial obstructions, and sometimes grant certain privileges to towns, upon whom duties are imposed. The riparian proprietor may erect a dam upon such a stream, without providing therein a passage for fish, so long as he violates no existing law, but subject to the well established right of the legislature to interpose. No individual can prescribe against this right, which is here held to belong to the public. Obstacles created, may be overlooked or tolerated, but as the country settles, and the fisheries become more an object of interest, they may receive the fostering care of the legislative power.

With regard to the formation of this branch of the *Damariscotta* stream, at a period beyond human memory, of which some evidence was received from tradition, the competency of which has been questioned, if from natural or artificial causes, the stream was, at some remote period, diverted into new channels, through which these fish were accustomed to ascend, in our judgment, so far as the fishery is concerned, the right of public control would attach therein, as an incident as effectually, as if it had remained unchanged.

But suppose the act of 1807 was an appropriation of private property to public uses, it is most clearly proved to have been

done, by the consent and acquiescence of *Kavanagh* and *Cottrill*, under whom the plaintiffs claim. They remonstrated against the general prayer of the petition of *John Borland & als.* at whose instance the legislature were induced to interfere ; but it appears that they were quite satisfied with the act, as it was finally modified. We perceive no sufficient reason, why their assent may not be proved by parol. When the constitution provides that private property shall not be taken for public uses, without just compensation, it must be understood to mean, a taking without the assent, or against the will of the owner. If given or dedicated by him to the public, it is rather received than taken.

If this was a case, where private property might be taken for public uses, although it might relate to an interest in land, no. deed or instrument of conveyance from the owner was necessary, the appropriation being proved by an act of the legislature, which is matter of record. He would have a right to such damages, as would be a just compensation. That is an equivalent, which is not itself an interest in land, but a collateral matter. In the case of *Clement* v. *Durgin*, 5 *Greenl.* 9, it was decided, that the right to damage, for flowing land by the owner of a mill, might be waived or relinquished by parol. There is a striking analogy between that case, and the one under consideration.

In addition to the direct evidence of assent by the parties in interest, it may well be implied from their long acquiescence. If their rights were infringed by an unconstitutional act of the legislature, it afforded no protection to those, who presumed to act under it. They were trespassers ; and the rights invaded might have been at once vindicated by a civil action. This acquiescence, which continued as long as *Kavanagh* and *Cottrill* lived, and the acts of co-operation, which are proved on their part, are ascribed in argument to their ignorance of the limitation of the legislative power. These gentlemen were not native born citizens, but they were merchants engaged in extensive business, men of high standing and consideration, in the part of the country in which they resided, possessed of great wealth, and largely interested in real estate. The sacredness of private property, and the protection which is thrown around it, could not have

been unknown to them; and they had it in their power, at all times, to command the services of eminent counsel.

It is said that private property was not here taken for public use; but that it was appropriated to the private use and emolument of other persons. The public had an interest in the preservation and regulation of the fishery, and in the removal of obstacles, by which it might be impaired or destroyed. This was best effected through the agency of persons, appointed by the neighboring towns, and by quickening and rewarding their diligence by a grant of the profits. It is a course of proceeding adopted by the legislature in many other cases, the authority of which has not been questioned.

If public purposes and uses were to be promoted, as they undoubtedly were in the case before us, it was no objection to the power of appropriation by the legislature, that it contributed also to the emolument and advantage of individuals or corporations. Many cases of this character exist, in which the legislative power is well established. Of this class is the right conferred on owners of mills, to raise a head of water necessary for their operation, although the lands of others are thereby injured and rendered unproductive. They are holden, as in other cases in which private property is taken for uses, in which the public are interested, to pay a just equivalent, unless the parties, affected by the flowing, consented thereto, without receiving damage, which, it was settled in *Clement* v. *Durgin*, might be proved by parol. And we are satisfied that there is equal reason for receiving the same testimony in the case in question.

From whatever source *Kavanagh* and *Cottrill* might have derived title to their land, and by whatever covenants it might have been protected, it was subject to the legislative power, either in the regulation of the fisheries, or by appropriation to public uses, if required by the public exigencies. The proprietors of the *Kennebec* purchase, if their patent covered this territory, and every successive owner, whether his title commenced by right or by wrong, held the land subject to this power. When, therefore, it was called into exercise, it cannot be deemed a violation of the constitution of the *United States*, which inhibits the passage of any law, impairing the obligation of contracts.

Cottrill & al. *v* Myrick.

If the legislature had a right to regulate the fishery in this stream, either in virtue of their general powers, or by the consent of the riparian proprietors, we find nothing in the act of 1807, which may not be regarded as necessary to effect that object. The *8th section*, so much complained of, merely authorized the committee, by whose agency the regulations were to be carried into effect, or any other person in their employment, to go on to any land, through any mill, or wheresoever it might be necessary for them to go, to discharge the duties imposed upon them by the act, without being considered as trespassers. All the purposes of the act might have been defeated, if this protection had been withheld. We are not satisfied that any of the objections, taken to the authority of this act, or to any of the other acts, regulating the fishery in *Damariscotta* river, ought to prevail.

The official character of the defendant is controverted. It is urged that the warrants, for calling the town meetings in *Newcastle* and *Nobleborough*, introduced by him, do not appear to have been served according to law; and *Tuttle* v. *Carey*, 7 *Greenl.* 426, is relied upon in support of this objection. We cannot regard it as sufficient to deprive the defendant of the protection, under which he justifies. The same objection was raised, and upon the same authority, in *Bucksport* v. *Spofford*, which was overruled, for the reasons there stated, to which we refer.

It is said, that the acting town clerks of these towns were not legally qualified. If they were parties to this record, and called upon to justify their official acts, they might be required to show, that they were legally invested with the authority they claimed to exercise. It is proved that they were in office *de facto*, in the discharge of the duties thereto appertaining. Upon this point, we hold this evidence to be sufficient for the purposes of the defendant. *Phillip's ev.* 180 ; *Fowler* v. *Bebee et al.* 9 *Mass.* 231. As to the proof that the committee were sworn, we think it competent, if it was necessary that they should be sworn, which is not required by the statute, providing for their appointment.

Upon the whole, the opinion of the Court is, that the act, which is the subject matter of this act, has been justified.

*Judgment for the defendant.*