PERCY SUMMER CLUB v. ASTLE et al.

(Circuit Court, D. New Hampshire. April 12, 1906.)

No. 315.

1. EQUITY—JURISDICTION—INADEQUACY OF LEGAL REMEDY.

A complainant claiming the exclusive right of fishing in a body of water may maintain a suit in equity, in the nature of a bill of peace, to protect such right by restraining other persons from fishing therein, who claim the right under a state statute as members of the general public, and from committing trespasses upon complainant's shore property which are only incidental to such fishing.

2. FISH—RIGHT OF FISHERY—PONDS AND LAKES IN NEW HAMPSHIRE.

By the ancient common or unwritten law prevailing within the locality now constituting the state of New Hampshire exclusive rights of fishing in lakes and ponds did not vest in the proprietor of the soil as such, but fishing, as well as fowling, was free or subject to public control.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fish, §§ 3, 16.]

In Equity.

Philip Carpenter, for complainant.

A. S. Batchellor, Henry F. Hollis, Crawford D. Hening and E. G. Eastman, Atty. Gen. of New Hampshire, for defendants.

PUTNAM, Circuit Judge. This is a bill in equity heard on bill, answer, replication, and proofs. The state of New Hampshire was allowed by the court to intervene, and it appeared by its Attorney General. The bill was brought to determine the rights of the complainant in the bed and waters of Christine Lake, formerly North Pond, situated in the county of Coos, containing about 140 acres, and in the fishery therein. It prays a decree adjudging the complainant to be the owner of the lands around and about and under the lake and of the waters thereof, and of the exclusive right of fishing in those waters. It also prays that the respondents named in the bill may be restrained from trespassing upon the complainant's lands around the lake, and from fishing in the lake, or setting up any claim adverse to the complainant in the bed or waters thereof.

The case shows that citizens and residents of the state of New Hampshire claim a public right to enter upon the lake for the purpose of fishing, and to take fish therefrom, and the respondents named in the bill stand upon that alleged right. The case also shows that the

Legislature of New Hampshire in 1887 (Laws 1887, p. 466, c. 86) passed a statute which, no doubt, had special reference to this particular pond or lake, providing that no action shall be maintained against any person for crossing uncultivated land to reach any public waters for the purpose of taking fish, unless actual damage has been sustained thereby, and also providing that, for the purposes of the act, all natural ponds and lakes containing more than 20 acres shall be deemed public waters. This is the only statute ever passed in or with regard to New Hampshire, either before or after the Revolution, expressly declaring by general legislation lakes or ponds, or the fish therein, to be public; but apparently Concord Mfg. Co. v. Robertson, 66 N. H. 1, 25 Atl. 718, 18 L. R. A. 679, decided in 1889, announced that the act is evidence of an understanding that a pond of 20 acres is public waters. Under these circumstances, having in view especially the intervention of the state of New Hampshire in this litigation, it is evident that, although the respondents might ordinarily be regarded as mere trespassers, yet here they may be said to represent a class; that class being all the residents of New Hampshire who may desire to fish in ponds or lakes of the character of that in dispute here. Therefore the case is sufficiently analogous to a bill of peace to justify the intervention of a court of equity, if other things are sufficient therefor, because it is very plain that actions at law would not give the complainant adequate relief. This proposition may well be illustrated by Lockwood Company v. Lawrence, 77 Me. 297, 52 Am. Rep. 763, decided in 1885. Of course, this is not a direct authority in support of the jurisdiction in equity of the federal courts, but we refer to it because it is undoubtedly within the usual rules in regard to the question of jurisdiction. There the bill was sustained against a number of persons, acting independently of each other, depositing refuse material in the Kennebec River, which, by commingling into one mass, seriously obstructed and impaired the wheels of the complainant's mill. No single tort-feasor in that case could be said to have done any material damage, or to be called on to make payment of any substantial amount on that account. Therefore, on ordinary suits at law, the complainant would have been practically without redress; but the results of the action of each tort-feasor combined, when commingled, created a positive and substantial injury which equity justly restrained. So here a tort committed by a single fisherman would be so minute as to be hardly injurious; and certainly it would afford the complainant no substantial basis of relief, while, under the circumstances, the unrestrained acts of numerous fishermen, if they were unauthorized, would destroy the value of the lake as a preserve if the complainant is entitled to hold it as such, so that, as in the case cited, there could be no substantial relief except by a proceeding of the character now at bar. The complainant claims to have expended a very large amount of money, said to be at least $50,000, in preparing, constructing, and maintaining what is necessary to make the lake a private fishery and the incidents thereof, all of which would be of little, if any, value in the event its corporators must share with all the residents of New Hampshire. Therefore we are of the opinion

that, if the complainant is right on the merits, it is entitled to maintain this bill so far as the fisheries are concerned, and incidentally entitled to the same remedies so far as concerns any trespasses which are only incidental to the unlawful fishing.

The complainant's title originated in grants from the crown through the governor and commander in chief of the province of New Hampshire in 1773. At the time the grants were made the locality was a wilderness. The pond contains an outlet connected with the Ammonoosuc river; but the record shows no inlet except ordinary forest brooks. A correct description of the pond is given in State v. Roberts, 59 N. H. 484, 485. In the absence of any evidence to the contrary, we assume that trout, which seem to be the only fish in question, are free to migrate to and from the pond, so that, even though the proprietors of the pond are proprietors of the fishery therein, the fish themselves are within the rule as to animals feræ naturæ. So far as we can discover, this is not disputed with reference to the case before us.

For the case at bar, the complainant, as against mere trespassers, holds sufficiently under the title originally granted by the crown, and also owns and holds sufficient apparent right to the surrounding shores, which are, so far as we are informed, uncultivated and still in the state of nature. It is clear, so far as we are concerned, that the complainant owns the soil under the pond, but, of course, it does not own the fish until captured, nor the water of the pond in its natural condition, so that the substantial question is not as to the shores, nor as to the soil under the pond, nor as to the water, but as to what is ordinarily known as the "fishery"; that is, the exclusive right of taking fish from the pond. The distinctions made in these respects in State v. Roberts, 59 N. H. 484, 486, between the titles to the fish, the water, the soil, and the fishery are correct according to the fundamental principles of the common law. If the complainant is the proprietor of the fishery, then this bill may well be maintained, for reasons we have stated, to restrain trespassers upon its inclosed lands, which are connected with, and incidental to, its fishery. If it has no right to the fishery, then this bill relates to mere trespasses upon uncultivated lands, involving no damage except nominal, and it cannot be maintained according to the rules of equity jurisdiction.

There is no title in the complainant to the fishery, except, or unless, what arises as an incident to the grant of the shores and of the soil of the pond. No special grant, and no legislation brought to our attention, gives it any additional or peculiar right. Therefore the question is whether, with regard to ponds like that in issue, by the ancient, common, or unwritten law prevailing within the locality now constituting the state of New Hampshire, exclusive rights to fisheries vested in the proprietors of the soil as such, or whether, by the same law, fishing, as well as fowling, were and are free, or subject to public usufruct so far as the same can be pursued without injury to inclosed or cultivated lands. While we shall return to this particular topic again in another connection, we have diligently searched the legislation and the ordinances relating to the locality now constituting the state

of New Hampshire, beginning with its settlement and coming down to the present day, and have found nothing bearing on the public rights to fish or to fowl, which go hand in hand to a very considerable extent, except as follows:

Each party has cited numerous statutes which we do not deem it necessary to comment on, because all so cited are reconcilable with either theory as to private rights to the fishery presented to us, having in mind, of course, that these rights, even if exclusive, are clearly subject to certain legislative control, because, with other reasons, fish are classed with other untamed, migratory animals, all as pointed out in State v. Roberts, 59 N. H. 484, already referred to. The only act with reference to fowling which we have found in the whole history of the inhabitancy of the locality of New Hampshire is that of 1862, afterwards enacted in Gen. St. 1867, c. 251, § 4, as follows:

"Any person owning or occupying land may forbid the destruction of the birds on the same, at any season of the year, by public notice in any newspaper published in the county, or by posting notice on the land; and any person taking or destroying birds on said land in defiance of said prohibition shall be subject to a penalty of one dollar for each bird so destroyed, in addition to the penalties named in the preceding section."

This is a recognition of the privilege, universally recognized in the maritime states of New England, of public hunting through the forests and other wild lands until they are inclosed, a privilege which has been generally exercised in the same manner with reference to fishing in the ponds and streams of the same territory, so far as the same have remained unoccupied by structures or inclosures of the owners of the soil. The only other statute having a bearing on this question is chapter 86, p. 466, of the Acts of 1887, approved on October 25th, already referred to, which, omitting the fourth section, of no consequence here, is as follows:

"Section 1. No action shall be maintained against any person for crossing uncultivated land to reach any public water for the purpose of taking fish unless actual damage has been sustained.

"Sec. 2. In all actions brought to recover damage for crossing land to reach any public water for the purpose of taking fish, the costs shall be limited to an amount not exceeding the damages recovered, if such damages do not exceed $13.33.

"Sec. 3. For the purposes of this act, all natural ponds and lakes containing more than twenty acres shall be deemed public waters."

It is true that section 3, declaring ponds containing more than 20 acres public waters, is expressly limited to the purposes of the act, but the purposes of the act concern the very question we have before us; that is, taking fish. Therefore, so far as this proceeding is concerned, the Legislature of New Hampshire has either sought to make this pond public or has declared that it was public by the common law. So far as it constitutionally could, it has either created the pond into a public water or recognized it to be such for all the purposes which we have before us. If it is affirmative legislation, it is limited, of course, to ponds containing at least 20 acres, in which class the pond in question belongs; while, if it is a recognition of what before existed, it is to be construed as remedial only so far as ponds containing 20 acres or more are concerned, while it would not stand in the way of the proposition

that at the common law of New Hampshire ponds of less than 20 acres are public waters. It needs no explanation on our part to establish the proposition that if the Legislature had the power to declare ponds exceeding 20 acres, including the pond in question, public waters, or that, if the statute of 1887 properly recognized a common-law rule in New Hampshire by virtue of which such ponds are public waters, this suit cannot be maintained, because there is no claim on the part of the complainant that there is any exclusive right of fishery if the waters in question are public within the meaning of that word as used in the statute cited. We will only add that, so far as we can discover, this statute remains in full force and unmodified.

Each party claims that he is protected by the judicial decisions of the New Hampshire courts when properly reduced to the elements which they fairly determine. We may observe at the outset that much relied on on this point by the parties, pro and con, is dicta. The complainant begins with State v. Roberts, which came before the Supreme Court twice, each time in 1879. It first appears in 59 N. H. 256, and the second time in the same volume at page 484, 47 Am. Rep. 199. The precise question we have before us was not in issue, and the declarations of the court with reference thereto might have all been passed by and the result of these decisions have been the same, because the only principle applied was that, inasmuch as trout in a pond are migratory, the owners of the soil of a pond and its shores are subject, in common with other persons, to the general laws of the state for the protection and encouragement of the internal fisheries. Nevertheless, at the opening of the opinion at page 257 of 59 N. H. (47 Am. Rep. 199), Mr. Justice Clark observed as follows:

"At common law the right of fishery in navigable waters was public and common to all, and in waters not navigable it was limited to the riparian owner of the soil, and belonged exclusively to him."

But beyond proceeding on the general assumption that such is the rule in New Hampshire, the opinion is of no value to us. When the same topic came again before the court (at page 484 of 59 N. H., 47 Am. Rep. 199) it appeared that the respondent was indicted for catching four trout in a prohibited season, and that he owned the land around the pond, but that the pond was not screened, or otherwise inclosed, to prevent the free passage of fish to and from its waters. The case turned on the last fact, and the indictment was sustained. The common-law rule with reference to rights of fishery in non-navigable waters was assumed, at page 406 of 59 N. H., 47 Am. Rep. 199, to apply to the case; but, as we have already stated, the court found that the defendant had no exclusive property in the four trout before they were caught, so that his rights were controlled by the statutes of the state intended for the preservation and protection of the fisheries.

The question was discussed in Concord Manufacturing Co. v. Robertson, decided in December, 1889, but not reported until 1896, in 66 N. H. 1, 25 Atl. 718, 18 L. R. A. 679. The issue there was entirely aside from the question involved here, because there the boundary was by the pond, which necessarily excludes the title to its soil. State

v. Gilmanton, 9 N. H. 461, 463. In State v. Welch, however, 66 N. H. 178, 28 Atl. 21, also decided in 1889, and not reported until 1896, and a case which also related to this particular pond (Percy Summer Club v. Welch, 66 N. H. 180, 28 Atl. 22), apparently decided at the same time as State v. Welch, the precise issue we have here seems to have been involved, and the court found that Christine Lake was public water. In State v. Welch, 66 N. H. 179, 28 Atl. 22, the point seems to have been stated as follows:

"The bed of the pond was reserved, set apart, and held in trust for the public use. The club could not acquire the title by prescription, or by grant from the king or the executive branch of the provincial or state government."

Then the case of Concord Co. v. Robertson was referred to. These particular propositions, however, were clearly mistaken ones, because in other parts of New England, where the powers vested in the colonial authorities were no larger than those vested in the provincial authorities of New Hampshire, great ponds have been granted, and the title to their soil has been settled by the courts favorably to individuals; and the law throughout all the maritime states is clearly otherwise than thus stated. Commonwealth v. Vincent, 108 Mass. 441, 446; Watuppa Reservoir v. Fall River, 154 Mass. 305, 28 N. E. 257, 13 L. R. A. 255; Gould on Waters (3d Ed.; 1900) §§ 84, 182. In fact, the ordinance of 1641 was necessary to prevent towns from conveying away the soil of great ponds and fisheries therein. In this respect the soil and the fisheries of the nonnavigable rivers and of the great ponds and lakes stood in all particulars the same.

It is claimed that these two decisions in State v. Welch and Percy Summer Club v. Welch are conclusive on the complainant, who is in privity with the Percy Summer Club, which was a different corporation from the complainant here, but the corporation from which the complainant holds title. Of course, there could be no estoppel arising from State v. Welch, both because the result of a criminal proceeding estops neither party on a subsequent civil proceeding, and because, on the ordinary rule with reference to res judicata, there is no estoppel unless both parties are estopped. Percy Summer Club v. Welch was said to have been in the nature of a bill of peace, so that an adverse decision there would operate as an estoppel; but an examination of the record shows that this case was not properly reported. The bill was never dismissed by order of the court, but was finally disposed of by stipulation between the parties. Therefore there was no such solemn adjudication as is necessarily involved in the result of a bill of peace in order to operate as an estoppel. With reference to all three cases reported in 66 N. H., 25 Atl., there are various reasons why they, standing alone, can hardly be accepted as the regular and solemn conclusions of the Supreme Court of New Hampshire on the precise issue we have here; but Dolbeer v. Company, 72 N. H. 562, 58 Atl. 504, decided in June, 1904, must be accepted as construing them as decisive against the complainant, so far as the local tribunals can accomplish that result. But as Dolbeer v. Company merely accepted the apparent reasoning of Concord Manufacturing Co. v. Rob-

ertson, State v. Welch, and Percy Summer Club v. Welch, it becomes incumbent on us to examine those decisions further with reference thereto.

We have already referred to the peculiar grounds stated in State v. Welch, to the effect that the title to the bed of a pond could not be acquired by grant, and that in any event the pond would remain in the public as trustee. We have said that this was not the provincial law, and we believe this is the first time, and the only time, that a suggestion of that character has been made by any of the New England courts. Therefore we pass that by, and turn back to examine the grounds expressed by the Supreme Court of New Hampshire in Concord Co. v. Robertson. So far as we can discover, they are as follows: At page 24 of 66 N. H., page 729 of 25 Atl. (18 L. R. A. 679), the opinion, referring to the Massachusetts ordinance of 1641, cites the expression of Chief Justice Shaw in Commonwealth v. Alger, 7 Cush. (Mass.) 63, 68, as follows:

"The great purpose of the sixteenth article of the Body of Liberties was to declare a great principle of public right, abolish the forest laws, the game laws, and the laws designed to secure several and exclusive fisheries, and to make them all free."

This is undoubtedly true, but the fact that the ordinance was deemed to be necessary for that purpose affords a presumption against the position of the Supreme Court of New Hampshire, if it affords any presumption at all. At page 6 of 66 N. H., page 720 of 25 Atl. (18 L. R. A. 679), the opinion, contrasting conditions in New Hampshire with those in England, uses the following expression:

"Liberties of hunting and fishing, and other common rights, always exercised here in the wild and unoccupied districts of the public domain, and retained in large ponds and tide waters after the adjoining dry land became private property," etc.

There is no question that from the earliest settlement of the country fishers and fowlers have roamed undisturbed forests, lakes, and rivers throughout the maritime provinces and states of New England, with some exceptions. But this fact applies, also, to the nonnavigable rivers, of which the opinion makes no mention. It is also true with reference to Massachusetts and its district of Maine, as to which there is no question, that individuals may acquire title to the bed of nonnavigable rivers, and to the beds of ponds and lakes, and that, when acquired, the right of fishery follows it. The opinion cites no evidence whatever of either historical or legal character that, in this respect, there was any peculiarity as between the province and the state of New Hampshire and other provinces and states, or between ponds and nonnavigable rivers. At page 24 of 66 N. H., page 729 of 25 Atl. (18 L. R. A. 679), the opinion observes as follows:

"In this state free fishing and free fowling in great ponds and tide waters have not needed the aid of a statute for the abolition of written, or for the declaration of unwritten, law. So far as the ordinances of 1641 'meaning those of Massachusetts Bay Colony' introduce or affirm these liberties, it was an enactment of New Hampshire common law."

If this proposition is true, the question is settled adversely to the complainant. But, again, the opinion cites no legal or historical facts sustaining the statement. The difficulty rests at this precise point.

Neither does the Supreme Court of New Hampshire rely on the Massachusetts Bay Colony odinance of 1641, or on the statute of 1887, to which we have referred. To begin with, the court, if correct, is entirely outside of that statute or that ordinance, because the statute and the ordinance relate only to ponds and the shores of the sea, while the proposition which we have cited from page 24 of the opinion is so broad that, though in terms it speaks only of ponds and tidewaters, it necessarily involves the nonnavigable streams, because the practices as to fishing and fowling have been the same with the one as with the other, and the methods adopted by the court for reaching its conclusion prohibit any distinction as between them. There have been several references in the New Hampshire decisions to the ordinance of 1641, but the most that has ever been said in that respect was in Clement v. Burns, 43 N. H. 609, 621. There the opinion observes that, as a rule of positive law, the ordinance is not binding in New Hampshire, but that, in view of the practical union between the colonies for so long a time, it would naturally be expected that the same usages would spring up in New Hampshire under that ordinance with reference to the rights of riparian owners in the shores of navigable waters. This is but little more than was said by the late Chief Justice Smith in Smith's New Hampshire Reports, 503, to the effect that, during the union with Massachusetts, many of the usages and customs which now obtain, and which form a part of the common law of New Hampshire, were formed and originated. However, the manner in which the Supreme Court of New Hampshire distinguishes a great pond demonstrates beyond question that it in no way relies on the Massachusetts Bay Colony Ordinances. It puts the distinction as follows:

"However slight the argument in favor of any particular dimensions in determining whether a pond is public or private property, the law requiring a decision of the question authorizes the adoption of a necessary rule. A standard of size seems to be indispensable, and, if a more satisfactory measure is not found, ponds of more than 10 acres may properly be classed with Sanbornton Bay." Concord Mfg. Co. v. Robertson, 66 N. H. 27, 25 Atl. 719, 18 L. R. A. 679; Dolbeer v. Suncook Waterworks Co., 72 N. H. 564, 58 Atl. 504.

It is possible that the New Hampshire courts might have rested this result on the act of 1887, on the ground that, by ancient usages in the maritime provinces, the right of fishery in the proprietor of the soil was of such a peculiar nature that it might be appropriated by the Legislature. It is true that the courts have never quite gone to this extent, although they have laid down very broad rules as to the powers of the Legislature over internal fisheries. Cottrill v. Myrick, 12 Me. 222, 229; Lunt v. Hunter, 16 Me. 9; Parker v. Cutler Milldam Company, 20 Me. 353, 358, 37 Am. Dec. 56. They have even gone so far as to hold that such fisheries might be destroyed by the Legislature without compensation, if the destruction was incidental to the larger purposes for which nonnavigable rivers and ponds may be improved. However, as we have seen, the court relied on no statutory regulation, either the act of 1887 or the colonial ordinance of 1641.

By the common law of England the right to the soil of ponds and lakes, and the right to the soil of nonnavigable rivers, and the fisheries

in each of them, rested on the same fundamental rules and principles. As to the adoption of the English common law in New Hampshire, there is no doubt in reference to the general rule, as shown by the following expression in State v. Rollins, 8 N. H. 550, 561:

"There seems to be no reason to doubt, therefore, that the body of the English common law, and the statutes in amendment of it, so far as they were applicable to the government instituted here, and to the condition of the people, were in force here as a part of the law of the province, except where other provision was made by express statute or by local usage."

So far as Massachusetts is concerned, and, of course, this involves Maine, it seems to have been held that, from the earliest settlement, the English common-law rule as to the soil of ponds and nonnavigable rivers, and the fisheries therein, was adopted as a part of the common law of the colony. This is demonstrated by the fact that the ordinance of 1641 was deemed necessary in order to save the so-called great ponds from the operation of the English practices. Consequently, from the earliest date of the settlement in Massachusetts, and incidentally in Maine, we find the courts always distinctly and emphatically announcing the English practices in these respects as a part of the common law. On the other hand, in New Hampshire there never was any legislation like the ordinance of 1641, and there never was, as we have shown, any line of judicial decisions like those of Massachusetts to which we have referred. That there was no such ordinance, and that there were no such judicial decisions, afford presumptions either way. One was that the people of that locality were content with the English practices, and the other was that, as the English practices had not been in any way adopted, there was no necessity for an ordinance like that of 1641. The question is what is the evidence, historical or judicial, in regard thereto. From this standpoint, it seems very difficult to separate rights in nonnavigable rivers from rights in ponds and lakes, as the two go together by the English common law, and, so far as we are advised, equally together by the local habits of the residents of the colony, province, and state of New Hampshire. As to this, the complainant says that the court discovered for the first time that in New Hampshire there was one common-law rule as to streams and another as to ponds and lakes. This is correct. Moreover, until the opinion in Concord Co. v. Robertson, the local tribunals of New Hampshire apparently assumed that there was no such distinction. In Greenleaf v. Kilton, 11 N. H. 530, 533, the opinion stated that a boundary by a river above tide water uniformly passed the title to the middle of the stream, including the water and the bed of the river; and this rule has been reiterated many times, and never questioned. Therefore, inasmuch as it is positively declared that the bed of a nonnavigable river may be granted free from a public trust, there would seem to be no reason for the proposition that the bed of a pond might not likewise be so granted. In Bullen v. Runnels, 2 N. H. 255, 258, 9 Am. Dec. 55, decided in 1820, it was said generally that a grant of waters is not void, but passes the right to use it for fishing, relying here on the English rule. In State v. Franklin Falls Co., 49 N. H. 240, 250, 6 Am. Rep. 513, the

court laid aside all question as to the right of fishery; but, in Beach v. Morgan, 67 N. H. 529, 530, 41 Atl. 349, 68 Am. St. Rep. 692, which was decided after Concord Co. v. Robertson was decided, but before the opinion was reported, Mr. Justice Isaac W. Smith, speaking in behalf of the court, states that the stream not being navigable, and, not being public water, "the right of fishing in it is limited at common law to the riparian owner of the soil, and belongs exclusively to him, unless the defendant shows a right acquired and some way recognized by law." It is to be noted that in support of this proposition he cites State v. Roberts, 59 N. H. 256, 47 Am. Rep. 199, thus assimilating the law as to ponds and nonnavigable streams. In Beach v. Morgan the question in issue was the right at the common law of New Hampshire of the proprietor of the bed of a river to an exclusive fishery. This seems to have been positively sustained, and the rule of the opinion in behalf of the court in State v. Roberts was accepted as the ground of the decision; thus, as we say, assimilating ponds and non-navigable rivers.

Reference has been made to Thompson v. Androscoggin River Imp. Co., 54 N. H. 545, but this classifies itself with other cases to which we have referred, which, after all, are not in point. As to some of the decisions, we should perhaps observe that they relate to Winnepisogee Lake and Sunapee Lake, which, in light of the practical application of the rules of law in the United States, must be regarded as exceptional. It is true that, in the United Kingdom, no exception is made in behalf of the public in regard to lakes or ponds on account of their size or navigability. The beds of all such lakes or ponds and the fisheries therein, with we think a single exception, are held to be private; but in this country a practical distinction has always been made in favor of certain great rivers, though above the rise and fall of the tide, and therefore in the sense of the common law nonnavigable, and of certain ponds and lakes which may well be regarded as inland seas. Therefore we are not obliged to distinguish the principles applicable to the case at bar on account of such exceptional bodies of water.

We have already observed that various cases have been cited pro and con, which, after examination, are found not to be in point here. So far as we do not make special observations with reference to any cases cited, they classify themselves into this list. We should, however, refer to Angell on Water Courses and Gould on Waters, both of which are works of the highest authority, and each of which, in all their editions, give the common law of the New England maritime states as maintained by the complainant, without the slightest suggestion that the common law of New Hampshire differs in this respect. This has been assumed by the courts of New Hampshire from the beginning until Concord Co. v. Robertson. We have also shown that this and the other cases which led up to Dolbeer v. Suncook Co., 72 N. H. 562, 58 Atl. 504, are inconsistent in not classifying nonnavigable rivers with ponds and lakes, and, also, that they fail to cite any evidence, legal or historical, in favor of the proposition that in New Hampshire "free fishing and free fowling in great ponds and tide-waters have not needed the aid of a statute for the abolition of written, or the

declaration of unwritten, law." We have also shown that Beach v. Morgan, 67 N. H. 529, 41 Atl. 349, 68 Am. St. Rep. 692, which is directly in issue with reference to nonnavigable streams, cites State v. Roberts, 59 N. H. 256, 47 Am. Rep. 199, which related to this particular pond, as authority for the rule with reference to nonnavigable streams, thus indicating that both ponds and rivers are in the same class, and ignoring Concord Co. v. Robertson.

Under these circumstances, according to well-settled rules with reference to the binding effect of the decisions of the local courts, especially where, as in the case at bar, they involve the common law, and not any particular ordinance or statute, there are very strong reasons for holding that we are not bound to follow Dolbeer v. Suncook Co. On the other hand, there are certain fundamental facts which are not to be ignored. Some are indicated from the citation from Chief Justice Shaw, at page 24 of 66 Atl., page 729 of 25 Atl. (18 L. R. A. 679), of Concord Co. v. Robertson. There is no question that at the date of the settlement of New England the "forest laws, the game laws, and the laws designed to secure several and exclusive fisheries," as existed and practiced in England, were regarded here as oppressive. Also, one of the most prominent facts in connection with the early settlers is the draft they constantly made on fish and game for the ordinary support of life, so that accordingly the general practice all through the maritime states for the first two centuries was that of free fishing and free fowling. As we have said, everybody roamed the forest, the rivers, the lakes, and the ponds at will, for whatever could be obtained. The common law of England in this respect is contrary to the fundamental rules of law, because, as the proprietor of the soil has only the usufruct of water, and only a right to appropriate the fish therein when caught, there would seem to be no reason for excluding the rest of the community therefrom so long as it can share without trespassing, whether by passage through the forests or by canoes or boats up the rivers and streams. The underlying principles of law in this respect are illustrated by the Roman law, and also by the early English law, as stated in Hunter's Roman Law (2d Ed.; 1885) 310, 312, 313, and as explained in Gould on Waters (3d Ed.; 1900) 108. One very significant fact is the deed from Passaconnaway and other sagamores to John Wheelwright and others of May, 1629, which covered the whole of the southern part of New Hampshire, and which has always had a certain recognition without regard to the legal questions which it involved. By this deed the sagamores not only reserved free liberties of fishing, fowling, and hunting for themselves and their subjects, but they also, describing the appurtenances of the lands conveyed, enumerated with the rest as follows: "With all the freedom of fishing, fowling, and hunting as ourselves." The habendum, also, was to Wheelwright and the other grantees named in the deed, and to "other the English that shall inhabit there." Belknap's New Hampshire, appendix to volume 1. It is also of some consequence that a thorough examination of the ordinances and statutes of the New Hampshire colony and province fails to show any legislation whatever in the line of the English legislation with reference to poachers, or to

prohibiting fishing or fowling, except some legislation during the early part of the eighteenth century for the preservation and increase of deer, which was in the interest of the public at large, and not of any individual proprietor.

Therefore, looking at all these considerations, the natural presumption would be in favor of free fishing and free fowling in the non-navigable rivers, ponds, and lakes in New Hampshire, and in the forests so long as they remain forests. In Concord Co. v. Robertson the opinion of the court at page 24 of 66 N. H., page 729 of 25 Atl., 18 L. R. A. 679, stated positively, as we have said, that free fishing and free fowling in great ponds did not need "the aid of a statute for the abolition of written, or the declaration of unwritten, law." It is true, as we have said, that the opinion does not sustain these statements by any citations or proofs of any nature. Neither are we able to sustain the opposite proposition by any positive citations or proofs, and, as against the direct decision on the issue before us in Dolbeer v. Suncook Co., we are not able to produce any prior or subsequent direct decision to the contrary. Therefore, notwithstanding our adverse suggestions with reference to the declarations and decisions of the Supreme Court of New Hampshire which were postponed to so late a date, and notwithstanding the difficulties in the way of accepting their propositions, we believe ourselves obligated to dispose of the issue before us in harmony with them.

Let there be a decree in accordance with rule 21 dismissing the bill, with costs for the respondent, the same to be without prejudice as to any question as to the title to the soil of Christine Lake or to the lands about the same.