### A. L. ARPIN, Plff.,

*v.*

## PORTO RICO POWER & LIGHT COMPANY, Dft.

San Juan, Equity, No. 374.

1. Under the Spanish law of waters of 1879 (extended to Porto Rico in 1886) Spain was the owner of the beds (and the appurtenant rights) of non-navigable streams in Porto Rico, which rights passed to the United States by cession from that country, and, later, to the people of Porto Rico by the act of Congress of July 1st, 1902 (32 Stat. at L. 731, chap. 1383).

2. The executive council of Porto Rico cannot, by taking part in the enactment of a law, devest itself of the powers which have been conferred on it exclusively.

3. Section 218 of said law of waters referred to prerogatives of the Crown of Spain regarding the use of land and water, and all such prerogatives ceased at the time of the cession of Porto Rico to the United States.

4. Plaintiff having acquired none of these prerogatives or franchises before the cession, and not having been granted any by the new sovereign since, cannot claim to have the right to exercise any such.

5. That section (218) is not in force in Porto Rico to the extent of conferring exclusive privileges on riparian owners, and general military orders Nos. 1 and 103 cannot be construed as granting any such exclusive privileges, nor as giving said section and vitality in that regard.

6. United States Revised Statutes, § 2476, has no application to Porto Rico.

7. The executive council of Porto Rico, subject to approval by the governor, has the exclusive power to grant franchises, and its acts in that particular are legislative in character.

8. The grant to it, by the organic act, of that power, carries with it, as a necessary incident, the power to confer upon the grantees of public-service franchises the right of eminent domain.

Arpin v. Porto Rico Power & L. Co.

9. Such franchises probably should be approved by the President, and all franchises granted by the executive council are subject to congressional control.

10. The insular law of eminent domain (Session Laws 1903, p. 50), construed in conjunction with §§ 418 and 430 of the Civil Code, without recourse to the organic law, contain ample authority for the exercise by grantee of the right of eminent domain.

11. A franchise to develop a water power and thereby create electric energy, to be sold to the public at rates to be regulated by the government, is a public-service franchise, and the grantee thereof can exercise the right of eminent domain.

Opinion filed December 31, 1906.

_____

*N. B. K. Pettingill, Esq.,* solicitor for complainant.

*Henry F. Hord, Esq.,* solicitor for defendant.

RODEY, Judge, delivered the following opinion:

This cause is before the court for decision of the issue raised by respondent's general demurrer to the bill of complaint. The prayer is for an injunction and general relief. A statement of the case is as follows:

The controversy arises out of the claimed right to generate electricity from the power of the waterfall on the La Plata river, known as "El Salto" or the Comerio fall, situated near the center of the island, about 17 miles in a direct line slightly southwest of the city of San Juan, Porto Rico. It seems that the waterfall in question is the only considerable one in Porto Rico, and it is alleged to be adequate for the generation of elec-

Note.—As to the ownership of land under water, see note to Goff v. Cougle, 42 L.R.A. 161.

tricity up to probably several thousand horse power, and it is
intimated that, in a relative sense, all it requires for its utiliza-
tion is a waterwheel and a wire.   There are a few smaller falls
in other parts of the island, but not of sufficient volume to attract
much attention.   The one in question is said to be large enough
to furnish light, heat, and power for the city of San Juan and
vicinity, including trolley lines, and perhaps for quite a num-
ber of the northern and eastern towns of the island, as well as
for a portion of the southern section; at least, the franchise inti-
mates this, as it covers this ground, and that it was, or may be
is yet, contemplated to use its power for a trolley line clear across
the island, from San Juan to Ponce; and that quite or nearly
half a million people live within easy radius of its service. When
it is considered that the nearest available coal to Porto Rico is
that obtained from the United States, the price of which is nec-
essarily high, and that the island has no fuel of its own in quan-
tities, it can be seen that a franchise for the exclusive right to
use the power of this fall is a very desirable piece of property.

The references given in the bill, exhibits, and pleadings have
driven the court to a search into the history of the matter, and
we find that it has been the subject of strenuous contention be-
tween this complainant and his associates on one side, and one
Ramon Valdez and his associates and others on the other, ever
since, and perhaps even slightly before, the American occupa-
tion of the island in 1898,—each party all this time strenuously
contending for his own side, and opposing the efforts of the other
in this behalf.   This took place both before the insular courts,
the military authorities, during the military occupation of
Porto Rico, the executive council of the island, the Secretary
of War, and in this court.   The contending parties, respectively,
made strong efforts to become possessed of the title or the right

Arpin v. Porto Rico Power & L. Co.

to use the land forming the banks of the river at the point that includes the falls and some little distance above and below the same, under the belief, it seems, that this right or ownership gave the one securing it, either a great advantage, or an absolute right to a franchise under existing law. Each of the principals secured some of the land on both sides of the river, but complainant claims to have secured all of both banks that actually includes the falls. Suits about the land resulted between the contending parties in the insular courts, one of them being carried to the supreme court of the island. See Valdez v. Pedro del Valle Franco, pp. 25 et seq. vol. 1 (pamph.) Decisions Supreme Court of Porto Rico. It appears also that Valdez tried to get the franchise from the Secretary of War during the military occupation or government of the island, claiming to be entitled to it under Spanish law, and succeeded in obtaining a license to use the fall to generate electricity, but this was revoked later. Magoon's Reports on Law of Civil Government under Military Occupation, War Dept. 1903, p. 500. It also appears that all of the contending parties, either by themselves or their associates, appeared several times before the executive council of Porto Rico, each applying for a franchise to use this water power, and each of them claiming at all times to be solely entitled to receive or to apply for it, by reason of being the owner of all necessary, or at least sufficient, lands and easements at and surrounding the falls. It appears also that on these occasions complainant urged the executive council to declare the waterfall a public utility. At one time, it appears Valdez and his associates, under the name of the Rio Plata Electric Company, actually secured a franchise from the executive council, but for some reason this, as also another franchise granted at another time to one Vandergrift and his associates, lapsed. Com-

plainant also attacked the legality of this Vandergrift franchise
in this court. The suit remains in abeyance, probably also be-
cause of the franchise having lapsed. The granting of the for-
mer franchise resulted in a suit in this court by complainant
Arpin and one Noble, his associate, against Valdez and the said
Rio Plata Electric Company, which ·is numbered 31 on the
equity docket. A former judge rendered an opinion in that case
(1 Porto Rico Fed. Rep. pp. 394 et seq.), sustaining the demur-
rer, and, the complainants declining to plead further, the bill was
dismissed with costs. An appeal to the Supreme Court of the
United States was taken, but not perfected, owing, no doubt,
to the lapse of the franchise. The opinion, to some extent, ren-
ders some of the questions here subject to the rule of *stare
decisis,* but the "court should not extend any decision upon a
constitutional question if it is convinced that error in principle
might supervene." Pollock v. Farmers' Loan & T. Co. 157 U.
S. 429, 39 L. ed. 759, 15 Sup. Ct. Rep. 673. We think there
are many points here presented that cannot be considered as
*res judicata.*

It seems that Valdez alone, or with his associate, is, or was,
the owner of a little narrow-gauge railroad some 5 miles in
length, from the town of Bayamon to Cataño, the latter being
situated across the bay from the city of San Juan, and over the
right of way of which little railroad probably the transmission
line for this power would be located on the way from the falls
to San Juan, and for the motive power of which railroad the cur-
rent might also be used; and that Valdez also runs a ferry across
the bay to San Juan in connection with said little railroad, and
that he is, or was, interested in the lighting of the city of San
Juan through a power-plant concern; and it further appears, ac-
cording to the allegations of the bill, that the concern **running**

Arpin v. Porto Rico Power & L. Co.

the trolley lines and a competing light plant in the city of San Juan, together with the concern that runs this Valdez plant, railroad and ferry, have combined as the Porto Rico Power & Light Company (the defendant here), and have secured this alleged franchise which is now the subject of this controversy.

The present bill of complaint sets out the doings of the contending parties as aforesaid during the past eight or more years in the premises, with considerable detail, and also sets out descriptions of the property acquired by both parties on the banks of the river at and near the point that includes the waterfall, and there are filed with the bill many exhibits and a map for the information of the court.

The bill also, with considerable detail, charges the executive council of the island and the franchise committee thereof with repeated acts and doings against the alleged legal rights of the complainant in such a way and of such a character as that, had respondent moved to that effect, the allegations, or some of them, might have been stricken from the record, as they were not necessary to a decision of the legal questions involved; but, instead, opposing counsel saw fit to file a general demurrer only.

Before proceeding with the discussion of the points involved, the court pauses to say: That the controversy appears as between these parties to be purely a selfish one; each is doing his utmost to possess himself of this natural monopoly through a franchise, and to prevent the other from either getting or availing himself or itself of it. All their efforts in the purchase of the land and before all the courts and officials have been solely with that end in view. They are entitled to no consideration as philanthropists, even if their strict legal right to get the franchise, if they can, cannot be questioned. But with this or with the alleged conduct or motives of a co-ordinate branch of the government, the

court has nothing to do. Neither has it anything to do with the wisdom or expediency of the island government, at this early stage of its American history, granting a franchise at all, for such an easily utilized natural monopoly, instead of causing it to be developed by and for the people themselves. We can look only to the legality of acts done, and must presume that all that was done by the legislature and the executive branch of the government, involving discretion, was for the best. All the facts, figures, and calculations were before the executive council when they acted, and they had to consider what would, in their judgment, be best under all the circumstances, for all the people affected, in the utilization of this water power. The President of the United States or Congress alone have power to consider the other matters referred to in the bill, if parties interested think reasons exist, or can show cause, for calling attention to them, and, if there is just cause for complaint in this regard, complainant owes a duty to the public to carry it to Washington; because Congress has reserved to itself the right finally to affirm or set aside all grants of franchises in the island (§ 32, organic act, 31 Stat. at L. 77, chap. 191); and it is probably also true that even such a franchise as the one here discussed should be approved by the President under § 2 of the resolution of May 1, 1900 (31 Stat. at L. 715).

The bill of complaint sets out so many alleged facts upon which rights of complainant are claimed to be based, and the brief of his counsel sets out so many weighty and clear-cut questions of law based thereon, as that, in the opinion of the court, there is good probable cause for the filing of the bill, and great public necessity that the questions involved should be passed upon by the court.

It is claimed that what is known as the "law of waters" of

Spain, which was promulgated in that country June 13, 1879, and extended to Porto Rico by royal order of April 5, 1886, and published in Porto Rico on the 28th of that month, is, under the law of nations, and by virtue of the organic act, in force in Porto Rico. The said law of waters is an elaborate royal decree on the subject, and comprises a lot of substantive laws and also rules and regulations with reference to property rights in waters, and the prerogatives of the Crown regarding the same. Códigos, Leyes, y Tratados Vigentes, Apendice (Ochoa) 564 et seq. Under this law, without question, the Crown of Spain was the owner of the beds of non-navigable streams in Porto Rico, and under § 8 of the treaty of Paris, these river beds and their appurtenant rights, if any, became the property of the United States. This change of ownership is not disputed. It may be added, for whatever weight it may have, that § 414 of the Civil Code of Porto Rico, adopted in 1902, provides that rivers and their natural beds belong to the public domain. However, the nation did not retain the actual title to non-navigable river beds in Porto Rico very long, for by act of Congress of July 1, 1902 (32 Stat. at L. 731, chap. 1383), it is provided that the President shall take certain reservations of the public property in Porto Rico for the use of the nation, and that "all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island, and not so reserved, be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island." So it would seem that the actual fee in such river beds is now vested in the people of Porto Rico. But previous to this transfer of title, under § 13 of the organic act, these rivers, etc., had been placed under the control of the

II. PORTO RICO.—21.

island government, to be administered for the benefit of the people of Porto Rico.

It is further contended that § 218 of the said law of waters of Spain, although not adopted in the local Code, is also in force, under the organic act and international law and the decisions of the Supreme Court of the United States, and because § 432 of the Code provides that anything not expressly determined by the provisions of this chapter (the Code) shall be governed by the special law of waters (meaning the Spanish law of waters aforesaid). A good translation of the section of the Spanish law of waters referred to is as follows:

"In navigable or floatable rivers, as well as in those which are not such, the governor of the province shall have power to grant the authority for the establishment of mills or other industrial works in buildings situated near the edges, to which the necessary water is conducted by means of a canal, and which afterwards returns to the current of the river. In no case shall this authorization be granted to the detriment of the navigation or flotation of rivers and to existing industrial establishments.

"In order to obtain the authorization referred to in this article it is an indispensable requisite that the petitioner be the owner of the land on which he intends to construct the building for the works, or that he is authorized to build by the owner thereof."

The local legislative assembly is evidently of the opinion that this entire law of waters is in force, because it has attempted to amend it twice; first, on March 12, 1903, Sess. Laws P. R. 146; and second, March 9, 1905, Sess. Laws P. R. 187, both houses concurring in the enactments. The former is a statute entitled: "An Act to Amend the Law of Waters." By its provisions, an apparent effort is made to leave the entire old Spanish law of waters in force in Porto Rico, including not only the

Arpin v. Porto Rico Power & L. Co.

substantive laws, rules, and regulations, but perhaps, to some extent, also the prerogatives of the Crown contained in the same, and to confer on the present governor of Porto Rico, the executive council, and the commissioner of the interior, etc., respectively, all the duties which were to be performed by what the assembly evidently thinks were corresponding officials under the Spanish *régime*.

It is not necessary to express an opinion as to whether or not this act in fact, in so far as it can, revives the entire law of waters in Porto Rico, if the same was in part abrogated by the change of sovereignty, with the substitutions of officials as enacted; it would seem as though it would be in many ways contrary to the organic act and the laws of the United States, and even though the executive council itself took part in the passage of this last-mentioned statute attempting to amend and revive said law of waters, still we do not think the executive council could, in this or any other manner, devest itself of any of the powers which have been conferred exclusively, as against the house, upon it by Congress.

The only change this act would make in § 218 of the Spanish law of waters aforesaid would be to substitute for the words, "the governor of the province," the words, "the commissioner of the interior." However, this act only took effect March 12, 1903, and could have had no effect previous to that date back to the beginning of the American occupation of the island, but nevertheless complainant claims under this section, by reason of being the first person who owned or had the right to use the land on the banks of the river including these falls,—which it seems Valdez also claimed before the Secretary of War (Magoon, 496, supra),—that he, complainant, became vested with a prior right to get this franchise over any other person whatsoever; and that,

not only is the said § 218 in force for the reasons stated, but also under general orders No. 1 and No. 103 of the military authorities of the United States, promulgated while they occupied the island, before the organization of civil government.

The court cannot agree with this contention that this section of law is in force in this sense. It refers to prerogatives of the Crown regarding the use of land and water, and all such prerogatives as to the public domain ceased at the time of the cession of the island to the American government. We express no opinion as to its being in force otherwise. No authority save Congress, under our government, is vested with power to dispose of the public domain, so the section quoted could have no force in that regard after the signing of the treaty of peace, at least up to March 12, 1903, and complainant could acquire none of these prerogatives or franchise rights not definitely granted to him before the cession, and none have been granted to him since.

At any rate, under the section quoted, the grant of franchises or the right to erect these industrial works was discretionary with the provincial governor; he did not have to grant any such rights under the terms of the section. It is not claimed that he made any such grant to this complainant in Spanish days, nor is it claimed that complainant received any such grant from any source since American occupation.

This same sort of claim as to being entitled, as of right, to a franchise to use this very waterfall under claimed superior conditions, acquired during Spanish times even, was decided against Mr. Ramon Valdez, the claimant before referred to, by the Secretary of War, after the matter had been decided in his favor by the law officers of that department (Magoon, supra, 497). The refusal was based on an opinion of the Attorney General of the United States, dated July 27, 1899, to whom the War De-

partment referred the question. 22 Ops. Atty. Gen. 546. In that opinion the following points were specifically held, and, while not controlling, they are quite instructive here:

"In Porto Rico the Crown of Spain was the owner, for public use, of the proprietary rights of the natural beds or channels of rivers, both navigable and unnavigable, to the extent covered by the waters in their ordinary greatest swells.

"When public property is ceded by one nation to another, its disposition and control are thereafter regulated and governed by the laws of the new owner. . . .

"Neither the President nor the War Department has power to grant a concession of the right to use the water power of the River Plata in Porto Rico."

See also Harcourt v. Gaillard, 12 Wheat. 523, 6 L. ed. 716; 24 Ops. Atty. Gen. 8.

The court, after a full examination of the authorities, is therefore constrained to hold that § 218 of the Spanish law of waters, being inconsistent with the organic act and with our laws and system of government, is not in force in Porto Rico in the sense here contended for, and that the military orders before referred to could not, and did not, give it any vitality in that regard, nor did they of themselves create any water rights or privileges in complainant, that entitled him, as of right, to a franchise then or now; and that no rights other than those of an ordinary stream-edge riparian owner were acquired by him by virtue of purchasing any of the lands comprising the banks of the Rio Plata in this island, as it does not appear that complainant had any complete or vested franchise right under the said § 218 at the time of the taking effect of the treaty of Paris, and he could not have had, unless the same had been granted to him by the provincial governor. His rights now and since the treaty must

be measured by the law of Porto Rico and of the United States. St. Anthony Falls Water Power Co. v. St. Paul Water Comrs. 168 U. S. 349, 42 L. ed. 497, 18 Sup. Ct. Rep. 157. We do not think that § 2476 of the Revised Statutes of the United States (U. S. Comp. Stat. 1901, p. 1567), providing that: "All navigable rivers within the territory occupied by the public lands shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both" has any application to Porto Rico. It was first passed as long ago as 1796, and referred entirely to the territory then occupied by the public lands.

It is of course conceded that, in harmony with the rules of international law, as well as with the terms of the treaties of cession, the change of sovereignty should work no change in respect to rights and titles; that which was good before should be good after; that which the law would enforce before should be enforceable after the cession. Ely v. United States, 171 U. S. 220 et seq., 43 L. ed. 142, 18 Sup. Ct. Rep. 840. But that is not this case. It was held by the Supreme Court of the United States in More v. Steinbach, 127 U. S. 70, 32 L. ed. 51, 8 Sup. Ct. Rep. 1067, that: "The doctrine that the laws of a conquered or ceded country, except so far as affected by the political institutions of the new government, remain in force after conquest or cession until changed by it, does not apply to laws authorizing the alienation of any portions of the public domain, or to officers charged under the former government with that power. No proceedings affecting the rights of the new government over public property could be taken, except in pursuance of its authority on the subject."

Another point made in complainant's bill and brief is that

Arpin v. Porto Rico Power & L. Co.

the executive council of Porto Rico has no power to grant the franchise in question, because it is contended that it involves legislation regarding the exercise of eminent domain and the declaring of the use of the waterfall in question to be a public use or one of public utility. Let us first consider the question as to whether the executive council did have power, under the law, to grant this franchise.

The Foraker act (31 Stat. at L. 77, chap. 191, approved April 12, 1900), which is the organic act of the island, provides in the usual way for a legislative assembly of two houses, the upper to consist of eleven members, all appointed by the President, and six of whom are heads of departments, and the lower of thirty-five members, elected by the people of the island. Sec. 8 of the act provides: "That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States." Sec. 14 provides: "That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States." Sec. 15 provides: "That the legislative authority hereinafter provided shall have power by due enactment to amend, alter, modify, or repeal any law or ordinance, civil or criminal, continued in force by this act, as it may, from time to time, see fit." Sec. 27 provides: "That all local legislative powers hereby granted

shall be vested in a legislative assembly, which shall consist of
two houses: one, the executive council, as hereinbefore con-
stituted, and the other, a house of delegates, to consist of thirty-
five members, elected biennially by the qualified voters, as here-
inafter provided; and the two houses thus constituted shall be
designated 'the legislative assembly of Porto Rico.' "  Sec. 31
provides: "That all bills may originate in either house, but
no bill shall become a law unless it be passed in each house by
a majority vote of all the members belonging to such house and
be approved by the governor within ten days thereafter."  This
section has a proviso that all laws passed by the assembly shall
be reported to Congress, which reserves power, if deemed ad-
visable, to annul the same.  Sec. 32 provides: "That the legis-
lative authority herein provided shall extend to all matters of
a legislative character not locally inapplicable, including power
to create, consolidate, and reorganize the municipalities, so
far as may be necessary, and to provide and repeal laws and
ordinances therefor; and also the power to alter, amend, modify,
and repeal any and all laws and ordinances of every character
now in force in Porto Rico, or any municipality or district
thereof, not inconsistent with the provisions hereof."  Then
follows a proviso, about the meaning of which there is great
contention in this case.  This is its language: "That all grants
of franchises, rights, and privileges or concessions of a public
or quasi-public nature shall be made by the executive council,
with the approval of the governor, and all franchises granted
in Porto Rico shall be reported to Congress, which hereby re-
serves the power to annul or modify the same."

Congress was evidently not satisfied with the situation in
which it thus left this organic act, certainly as to franchises,
because eighteen days later, on May 1, 1900 (31 Stat. at L.

715), it passed a joint resolution, § 2 of which reads: "That all railroad, street railway, telegraph, and telephone franchises, privileges, or concessions granted under section thirty-two of said act shall be approved by the President of the United States, and no such franchise, privilege, or concession shall be operative until it shall have been so approved." Sec. 3 of this resolution provides: "That all franchises, privileges, or concessions granted under section thirty-two of said act shall provide that the same shall be subject to amendment, alteration, or repeal; shall forbid the issue of stock or bonds, except in exchange for actual cash or property at a fair valuation, equal in amount to the par value of the stock or bonds issued; shall forbid the declaring of stock or bond dividends; and, in the case of public-service corporations, shall provide for the effective regulation of the charges thereof and for the purchase or taking by the public authorities of their property at a fair and reasonable valuation. No corporation shall be authorized to conduct the business of buying and selling real estate, or be permitted to hold or own real estate, except such as may be reasonably necessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land; and this provision shall be held to prevent any member of a corporation engaged in agriculture from being in any wise interested in any other corporation engaged in agriculture. Corporations, however, may loan funds upon real estate security, and purchase real estate when necessary for the collection of loans, but they shall dispose of real estate so obtained within five years after receiving the title. Corporations not organized in Porto Rico, and doing business

therein, shall be bound by the provisions of this section so far as they are applicable."

So it must not be forgotten, that the executive council of Porto Rico, under the law, is a very different body from the ordinary territorial council or senate, because several of its members are, under the law, the heads of the departments, and the whole body is appointive, and remains in office four years, as against two years for the elective members of the house. It also holds sessions the year round, without reference to the regular session of the other body, at which latter time it sits as the senate in connection with it. In other words, it is a sort of board of managing directors of the affairs of the island.

It is strenuously contended by complainant that the law as thus quoted and referred to, particularly the proviso to § 32 confers only power to grant franchises on the executive council, but that it does not confer any power on that body to alone and of itself pass any special laws, because it is contended § 27 confers such power on both houses, together with the governor, as is customary, and that a proviso seldom confers power; that its province is to except something out of the general provisions preceding it; that the executive council may grant franchises, but must do it subject to existing general laws. And great stress is laid upon the fact that the language of the proviso is: "That all grants of franchises . . . shall be made by the executive council, with the approval of the governor." It is contended that this word "made" used in this proviso precludes the idea that any legislative power which is given by § 27 is taken away. That the act must be construed all together, and that it can be so construed and all parts given effect if this power to pass special laws is denied to the executive council.

Under the provisions of the Constitution, art. 4, § 3, giving

Arpin v. Porto Rico Power & L. Co.

Congress the right to "make all needful rules and regulations respecting the territory or other property belonging to the United States," it will be conceded that, as to a place like Porto Rico, Congress is supreme in so far as it can be supreme under our Constitution, and that its power to even create a legislature consisting of but one body cannot be questioned. Then why can its power to except a certain line of legislation, as it appears to have done by § 32, from the control of both houses, as given by § 27 of the organic act aforesaid, and confer it upon the governor and one of the houses alone, be questioned? We presume the power to do so is not questioned, but the fact that it has done so is. We are of opinion that the power thus given to the executive council and the governor to make grants of franchises is ample, independent of the other house, save that existing laws cannot be contravened. We make this holding notwithstanding the holding of Attorney General Knox in 23 Ops. Atty. Gen. p. 490, which we do not think conflicts, that: "The delegation by Congress to the executive council of Porto Rico, by the 32d section of the act of April 12, 1900 (31 Stat. at L. 83, chap. 191), of the power to grant franchises respecting public utilities in that island, did not confer upon it the other sovereign power of taxation, including the authority to exempt from taxation."

The points are not parallel. Exemption from taxation is as important as the granting of any franchise, and is not a necessary incident of it; and power to exempt from taxation is never implied, for obvious reasons of public policy. There are, no doubt, many things connected with franchises that the executive council would not have power to grant without the concurrence of the other house, but we do not think that fact defeats or renders inoperative the franchise in question.

It must not be forgotten that the power of the President of the United States was conceded to create the Philippine commission, which, after war had ceased in those lands, exercised supreme power, and it was confirmed by act of Congress (32 Stat. at L. 691, chap. 1369). This latter act establishes civil government in the Philippine Islands, this commission being given supreme power, limited only by the act itself and the underlying principles of American government. In § 1 of the act it is found that the enacting clause of the commission's legislation shall be: "By authority of the United States be it enacted by the Philippine commission." By § 63 of the act the power of eminent domain is conferred upon it, and § 74 confers upon it the power to grant franchises, with certain elaborate and well-guarded limitations. Thus it can be seen that, in this instance, Congress, in 1902, conferred exclusive legislative power and the right of eminent domain, as well as the power to grant franchises, on a commission, and this over eight millions of people, and which powers were continued at least for two years thereafter, until the coming into being of a legislative assembly under § 7 of the act.

It would be a useless act for Congress to give the executive council power to grant franchises if that body should be limited to grant only those which are provided for by general laws, because the other house could then prevent the granting of any charter by refusing to pass general laws, and it might occur, even, that the other house would refuse to pass any laws for the carrying out of the veriest details of a franchise the executive council might feel compelled, under urgent necessity for the public weal, to grant, and which might be entirely satisfactory to Congress and the President.

Unless the power to make grants of franchises containing

the power of eminent domain was given to the executive council by the proviso of § 32 of the organic act, the whole proviso becomes useless and meaningless, because there is hardly a public-service franchise that can be imagined that does not require such power; hence the proviso would confer a mere veto power against the acts of itself on the executive council and the other house, when they act jointly, and they have that already as a branch of the legislative assembly. If, when the executive council frames a franchise, the house must vote on it simply because it has, and cannot avoid having, legislative provisions in it for the mere and necessary carrying out of its objects, then the house has taken just as much part and has granted or "made" the franchise as much as the executive council has, and the proviso in § 32 is even worse than meaningless; it would be ridiculous.

We are fully aware of the weight that ought to be given to the principle that, "in every statute authorizing or requiring a certain act, there is implied, as if there written, the direction that such act shall be done with reference to, and in conformity with, existing laws on the subject." See opinion of Attorney General Moody, 25 Ops. Atty. Gen. 341, military academy matter.

This rule undoubtedly applies with great force in ordinary cases, but the statute being discussed is a most extraordinary one. Still, even while having that in mind, we feel that Congress did not intend by § 32 of the organic act to leave it in the power of the lower house of the legislature to thwart the very object of the law. The case is unique and the conditions that brought about the enactment were also unique, and sufficient to induce Congress to reserve the final word of approval of franchises to itself and the President. However, we do not think

we are in this case driven to the necessity of making this holding in order to hold the franchise in question good, because, even though the franchise itself purports to be a grant in the nature of a legislative act (see the copy of it at the end of this opinion), still, both houses of the legislature enacted a general law for the condemnation of private property for public use, on March 12, 1903, Session Laws P. R., p. 50, and we think a reasonable construction of its terms embraces the power of eminent domain required for the utilization of this particular franchise. Section 3 of the act in question, which provides for the taking, damaging, or destroying of private property for a public use, states that it may be done: "C. For the construction of irrigating canals, flumes, aqueducts for the water supply of cities and towns, sewers, drains, bridges, viaducts, dams, and weirs." We think, from an examination of the entire act, that these three latter words, "viaducts, dams, and weirs," are not limited by the previous words, "aqueducts for the water supply of cities and towns," in the light of the whole act, and therefore embrace the taking of whatever private property it may be necessary to take under this particular franchise. This act is a lengthy and most elaborate piece of legislation, and fully protects the rights of all owners of property, and provides for just compensation for the taking, and for a jury trial and all proper right of appeal to even the Supreme Court.

In addition, the legislature of Porto Rico, both houses also acting, passed an act on March 9, 1905, previous to the date of this franchise, providing that if, in the judgment of the executive council, it should appear that possession of property on either or both banks of this particular river at the falls is necessary for the granting of a proper franchise for the development of the water power for any public use beneficial to the people of

Porto Rico, the executive council could, upon resolution, author-
ize condemnation proceedings to be brought by the attorney
general of the island to condemn what land might be necessary
for power houses, dams, and other improvements necessary to
develop said power, and providing that the holder of the franchise
should indemnify the people for the cost of such condemna-
tion. Section 2 of the act declares the dispossession thus pro-
vided for to be of public utility, and the money is appropriated
to pay for the expense of the condemnation.

There is also a statute in the Civil Code of the island, § 418,
declaring that all insular public works mentioned in the act are
declared to be of public utility, and that such declaration shall
carry with it (§2) the application of the law of eminent domain
to private property in accordance with the provisions of such
law and the rules and regulations for the execution of it. And
it is provided in § 430 of the same Code that "the ownership
and use of waters belonging to corporations or private persons
are subject to the law of eminent domain for reasons of public
utility." It would seem, therefore, that there is ample law on
the statute books of Porto Rico, even without conceding this
much contested legislative power to the executive council alone,
to render it possible for this concessionee to avail itself of the
grant of the franchise which it possesses.

The court is unable to devest itself of the idea that the real
meaning of the proviso in § 32 of the organic act, providing
that all grants of franchises, rights, and privileges or conces-
sions of a public or quasi-public nature shall be made by the
executive council with the approval of the governor; and fur-
ther providing that even when thus granted the franchise must
be reported to Congress; and further providing by § 2 of the res-
olution of May 1, 1900, supra, that all railroad, street railway,

telegraph, and telephone franchises, privileges, or concessions granted under § 32 aforesaid, must be approved by the President of the United States, and shall not be operative until so approved,—is that the executive council and the governor were given power absolute to grant franchises without reference to the house of delegates, and that this grant of power includes the right to legislate, if necessary, for the exercise of eminent domain. What is the use of reading doubts into a series of statutes that are so plain? Where legislative or executive bodies exercise a discretion within their powers, courts have no power to interfere with them in the exercise of it. Gaines v. Thompson, 7 Wall. 347, 19 L. ed. 62; The Secretary v. McGarrahan (Cox v. United States) 9 Wall. 312, 19 L. ed. 583; Mississippi v. Johnson, 4 Wall. 475, 18 L. ed. 437; Marquez v. Frisbie, 101 U. S. 475, 25 L. ed. 801.

In fact, Congress, at another place in the organic act, conferred exclusive power on the executive council, as can be seen by § 36, where it is stated: "That the salaries of all officials of Porto Rico not appointed by the President, including deputies, assistants, and other help, shall be such, and be so paid out of the revenues of Porto Rico, as the executive council shall from time to time determine: Provided however, that the salary of no officer shall be either increased or diminished during his term of office." This, as can be seen, is a pretty important power, that in all the states of the Union is left to both houses of the legislature, yet, in this instance, it is conferred upon the executive council alone.

We have examined with care the ruling of the Supreme Court of the United States in the case of Perez v. Fernandez, 202 U. S. 90, 50 L. ed. 945, 26 Sup. Ct. Rep. 561, where it is held that it is the policy of the United States, evidenced in its legislation,

to continue to the people of this island the laws and methods of practice they are familiar with. But we do not think the holding in that case militates against the position taken by the court here, because that decision refers more particularly to laws and methods of practice and administration, and not to kingly prerogatives. Nor do we think that the views here expressed conflict with anything in Ortega v. Lara, 202 U. S. 339, 50 L. ed. 1055, 26 Sup. Ct. Rep. 707, wherein it is held that when political and legislative powers over territory are transferred from another nation to the United States, the laws of the country transferring, unless inconsistent with the provisions of the Constitution and laws of the United States, applicable thereto, continue in force until abrogated or changed by or under the authority of the United States, and that this general rule is applied to Porto Rico under the organic act, because we consider the points involved here as clearly showing such inconsistency.

The only other question requiring attention is as to whether or not the use to which this waterfall is to be put under the franchise, that is, to generate electricity to be sold to the people of San Juan and other places in the island at rates not to exceed the maximum rates fixed in the franchise, is in fact such a public use as that private property can be taken under the law of eminent domain, when due compensation is made therefor, to make it available to the concessionees. In so far as the local statutes can make it so, the taking has been declared to be for a public use,—p. 56, act of Porto Rico, 1905, supra, and provisions of Code, supra. Of course, no one will question the fact that the Constitution of the United States, by inference, and perhaps directly, prevents private property from being taken for a private use without the consent of the owner, with or without compensation, because it has been held it would be a violation

of the 14th Amendment. Citizens' Sav. & L. Asso. v. Topeka, 20 Wall. 655, 20 L. ed. 455; Fallbrook Irrig. District v. Bradley, 164 U. S. 112, 41 L. ed. 369, 17 Sup. Ct. Rep. 56. And, while the Constitution of the United States has not been in terms extended to Porto Rico by Congress, still all courts and officials of the government, as well as Congress itself, when construing laws or fixing the rights of individuals in territories, are bound by its fundamental principles. People v. Daniels, 6 Utah, 288, 5 L.R.A. 444, 22 Pac. 159; Lewis, Em. Dom. § 12; Downes v. Bidwell, 182 U. S. 263, 45 L. ed. 1097, 21 Sup. Ct. Rep. 770; Church of Jesus Christ of L. D. S. v. United States, 136 U. S. 1, 34 L. ed. 481, 10 Sup. Ct. Rep. 792. But it must not be forgotten that there is no such thing as unlimited power in any branch of the government of the United States. Citizens' Sav. & L. Asso. v. Topeka, supra.

In Porto Rico, as elsewhere, private property cannot be taken for a private use, because the Code provides: "Sec. 355. No person shall be deprived of his ownership except by a competent authority, and for a justified purpose of public utility, and after having been properly indemnified." And, in this regard, riparian rights are as sacred as any other sort of property. They cannot be taken save for a public use and after just compensation. Clark v. Cambridge & A. Irrig. & Improv. Co. 45 Neb. 799, 64 N. W. 239; Lux v. Haggin, 69 Cal. 255, 10 Pac. 674. But the power to take private property for a public use is never questioned.

"The power to take private property for public uses in the exercise of the right of eminent domain is an incident of sovereignty, belonging to every independent government, and requiring no constitutional recognition, and it exists in the government of the United States." United States v. Jones, 109 U. S. 513,

Arpin v. Porto Rico Power & L. Co.

27 L. ed. 1015, 3 Sup. Ct. Rep. 346; Sholl v. German Coal Co. 118 Ill. 427, 59 Am. Rep. 379, 10 N. E. 199.

"Upon the other hand, it is probably true that it is beyond the competency of the state to appropriate to itself the property of individuals for the sole purpose of creating a water power to be leased for manufacturing purposes. This would be a case of taking the property of one man for the benefit of another, which is not a constitutional exercise of the right of eminent domain." Kaukauna Water Power Co. v. Green Bay & M. Canal Co. 142 U. S. 273, 35 L. ed. 1010, 12 Sup. Ct. Rep. 173.

It is asserted in § 237 of the second edition of Lewis on Eminent Domain, that the power does not exist in any political division or public corporation unless granted by the sovereign power. Consequently it does not exist in any territorial government unless it has been expressly granted by Congress. We are cited in support of this doctrine to Newcomb v. Smith, 1 Chand. (Wis.) 71; and Pratt v. Brown, 3 Wis. 603. Although we have not seen these cases, we have grave doubts that this is a proper statement of the law, because the power would be implied where Congress gave territorial governments the power to grant franchises to railroads and other public-service corporations. Sec. 32 of the Foraker act aforesaid certainly shows that Congress intended to, and did, confer the power on the legislative assembly of Porto Rico, and, as we are holding here, also on the executive council and the governor in certain cases. People v. Daniels, supra.

There are many states of the Union that have no provision in their Constitutions prohibiting the taking of private property of one citizen and transferring it to another for his private use, but there is no need of any such provision, as was well said by Green, J., in Varner v. Martin, 21 W. Va. 548: "It was

doubtless regarded as unnecessary to insert such a provision in the Constitution or Bill of Rights, as the exercise of such an arbitrary power of transferring, by legislation, the property of one person to another, without his consent, was contrary to the fundamental principles of every republican government."

Yet, notwithstanding this universally admitted rule, there are cases where the general public policy of the state is such that, under constitutional provisions, in such states which were attacked, private property is permitted to be taken for private use, or at least what appears to be private use in the ordinary sense, upon just compensation being paid therefor.

All lawyers, of course, are familiar with the line of decisions, dating from almost the beginning of the government, in the New England states, particularly in Massachusetts, holding that the building of gristmills and sawmills on the streams in that section was a public use for which private lands could be over-flowed by the construction of the mill dam, on compensation being paid. Some cases have recently gone to the Supreme Court of the United States from Utah, which sustain this sort of taking. Such a one is Clark v. Nash, 198 U. S. 361, 49 L. ed. 1085, 25 Sup. Ct. Rep. 676, where it was held: "Whether the statute of a state permitting condemnation by an individual for the purpose of obtaining water for his land or for mining is or is not a condemnation for public use, and, therefore, a valid enactment under the Constitution, depends upon considerations relating to the situation of the state and its possibilities for agricultural and mining industries." And it was further held in this case that: "The rights of a riparian owner in and to the use of water flowing by his land are not the same in the arid and mountainous western states as they are in the eastern states."

Another case is that of Strickley v. Highland Boy Gold.Min. Co. 200 U. S. 527, 50 L. ed. 581, 26 Sup. Ct. Rep. 301, where Clark v. Nash was reviewed and approved. In the former case, the right of a mining company to condemn a right of way for an aërial bucket line across a placer mining claim belonging to another was sustained under the law in the state of Utah. An interesting case somewhat of this same character is the great case of Fallbrook Irrig. District v. Bradley, 164 U. S. 112, 41 L.. ed. 369, 17 Sup. Ct. Rep. 56, which Ex-President Harrison argued before the Supreme Court of the United States on the one side and Joseph H. Choate on the other. Mr. Justice Peckham in that case reviews practically all the leading authorities on the subject, and holds that the statute of California authorizing. the creation of these irrigation districts, and including people within such districts without their consent, and assessing their pro rata of the cost against them, is constitutional.

It is easy to find authority sustaining the position, and no. one disputes it, that telegraph, telephone, waterworks, street railways, gas companies, electric light companies, and all other public-service companies of similar character can be, and are, endowed by statute with the power of eminent domain; and the taking by them of the private property necessary is always held to be proper. It is not so easy to find direct authorities to sustain a taking such as this is, that is, appropriating the riparian rights of owners beside a waterfall so that electricity may be generated by a public-service corporation, with which to serve cities and towns, and to be put to such other uses as in the case at bar. In fact, we feel that, as to that point, we can adopt the language of the Supreme Court of the United States in Munn v. Illinois, 94 U. S. 133, 24 L. ed. 86, which is: "Neither is it a matter of any moment that no precedent can be found

for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. And it must also be conceded that it is a business in which the whole public has a direct and positive interest." This case was approved in Budd v. New York, 143 U. S. 517, 36 L. ed. 247, 4 Inters. Com. Rep. 45, 12 Sup. Ct. Rep. 468; and in Brass v. North Dakota, 153 U. S. 391, 38 L. ed. 757, 4 Inters. Com. Rep. 670, 14 Sup. Ct. Rep. 857. It was a case where a statute of Illinois arbitrarily made grain warehouses public concerns, and regulated their charges.

· The fact that the use of electricity for the purposes for which the franchise in the case at bar is granted is of such comparatively recent origin, no doubt accounts for this paucity of authority on a particular branch of a subject that is overburdened with authority in a general sense. Counsel for complainant has followed the text-books and cited two cases from Vermont and one from Virginia, as holding that the generating of electricity from a waterfall some distance away from where it is to be used, etc., is not permissible under the rule we are discussing. The first of these is the case of Re Barre Water Co. 62 Vt. 27, 9 L.R.A. 195, 20 Atl. 109. An examination of the case shows that it was an effort to condemn property for running small motors for light manufacturing, which properly was held not to be a public use for which water could be taken from a stream, under the power of eminent domain, to the detriment of mill owners. This was not a case where a public-service corporation, owing specific franchise duties to the public, was seeking to take the water.

· The other Vermont case cited is that of Avery v. Vermont Electric Co. 75 Vt. 235, 59 L.R.A. 817, 98 Am. St. Rep. 818,

54 Atl. 179. An examination of that case shows that it was an effort to appropriate water to generate electricity to run a railroad, and there was nothing in the charter which bound the petitioner to serve the railroad or anybody else, or to give equal advantages to all on demand at fixed charges, as in the case before us.

The third case is that of Fallsburg Power & Mfg. Co. v. Alexander, 101 Va. 98, 61 L.R.A. 129, 99 Am. St. Rep. 855, 43 S. E. 194. That was a case where a company sought to generate electricity from water power and utilize the same by transmitting it to its own plant and to those of some other individuals and corporations, and its effort was to condemn the water and the rights of others in the land, because it was called an "Internal Improvement Company," which, under the statute of that state, it was contended, gave it such right. The case is one of the strongest that can be found to sustain the right of respondent here. In the opinion, Cardwell, J., reviews practically every leading case on the subject, and holds that: "The test whether a use is public or not is whether a public trust is imposed upon the property; whether the public has a legal right to the use, which cannot be gainsaid or denied or withdrawn [at the pleasure] by the owner." Lewis, Em. Dom, § 165; Farmers' Market Co. v. Philadelphia & R. Terminal Co. 10 Pa. Co. Ct. 25, and many other authorities. In closing that opinion, the court uses language which we adopt here as our own: "To meet industrial progress, new conditions, and the ever-increasing necessities of society, the courts have gone very far in sustaining legislation conferring the franchise of eminent domain, and it is not necessary for us in this case, if we were so inclined, to question the soundness of the policy sustained in those decisions."

The franchise in the case at bar is conferred to generate, convert, and distribute for profit, the electricity from the falls. The route of transmission is described. Provision is made that an accurate survey of the route of transmission shall be filed with the commissioner of the interior for the approval of the executive council. Full right of eminent domain is granted to take all private property that may be necessary in the premises. All plans must be submitted to the commissioner of the interior, and the right is reserved to remove any of the structures that shall be an injury to public interests. Proper security is taken for the faithful performance of the conditions. The concessionee is made to agree to supply the electric current at rates which shall never exceed those specified in a schedule attached, and provision is made that the service shall be furnished to the public on demand, on equal terms to all, without discrimination. Two hundred and sixty cubic feet of water per minute to be taken from above the falls in the river is reserved to the government. Provision is made that a reserve steam plant, with capacity to supply the city of San Juan with light, shall always be available, and the whole franchise is subjected to the joint resolution of Congress, approved May 1, 1900, reserving the right of amendment, alteration, or repeal, and imposing restrictions as to stock issue, etc.

It would be difficult to find a franchise with better or more specific safeguards for the public's rights, than this one contains, if the maximum rates are not too high and it is right, as an economic question, to grant the franchise at all.

Under all the facts of the case, we have no hesitation in saying that the use for which it is sought to appropriate whatever property and rights must be appropriated by this concessionee is a public use of the most unquestionable character.

Arpin v. Porto Rico Power & L. Co.

Considering this whole question in the light of modern authority, it does appear as though the action of the executive council was a proper one. Here is a case where it cannot be disputed that the people of the island of Porto Rico are the owners of the river bed of this non-navigable stream, and, of course, of this fall and source of power. Neither can it be disputed, as we think, that the complainant has no rights therein, save such as he may have to the use of the water by reason of being the owner of land abutting on the edge of the stream. He has himself repeatedly endeavored to have the executive council of Porto Rico, acting in a legislative capacity, declare the fall a public utility for this purpose. It is probably one of the greatest public utilities the island possesses, and, while it will undoubtedly result in large profits to the concessionee, it will, at the same time, be of tremendous benefit to the people, who can be, and have a right to be, served by it. The fact that this water power will contribute to the emoluments or advantages of individuals or corporations does not vitiate the franchise if the use is in fact public. 10 Am. & Eng. Enc. Law, p. 1064; Re Townsend, 39 N. Y. 171; Cottrill v. Myrick, 12 Me. 222.

In Varner v. Martin, 21 W. Va. 534, it is laid down that: "First. The general public must have a definite and fixed use of the property to be condemned; a use independent of the will of the private person or private corporation in whom the title of property when condemned will be vested; a public use which cannot be defeated by such private owner . . . Second. This public use must be clearly a needful one for the public, one which cannot be given up without obvious general loss and inconvenience. Third. It must be impossible, or very difficult, at least, to secure the same public uses and purposes in any other way than by authorizing the condemnation of private property.

If any one of these essentials is wanting, the courts will declare the act of the legislature authorizing such condemnation of private property to be unconstitutional, because it would amount to taking private property for private, and not for public, uses."

We have no hesitation in saying that the conditions here, and the franchise in question, fully meet every one of these requirements. If complainant's riparian rights are taken from him, he will be entitled, under the statute before referred to, to have a jury assess his damages and have the compensation paid him before the taking; and, if not satisfied with the damages, he can appeal to the supreme court.

In the assessment of these damages, the complainant will be entitled to have considered every injury that is done to him, for the taking of his land, if any is in fact taken, and for the deprivation of his water rights to the full extent to which he may be deprived of them.

His property can be taken only in accordance with law, and there is a suit pending on the docket of this court, removed here from the insular court, No. 415 on the docket. In that suit all his rights will be preserved and just compensation must be made before any of his property can be taken. The demurrer will therefore be sustained with costs, and it is so ordered.

---

A Franchise Granting to the Porto Rico Power & Light Company, its Successors and Assigns, the right to Develop the Water Power known as "Comerio Falls," situated on La Plata River, for the Generation of Electrical Energy, and to Build, Construct, Erect, and Maintain Lines of Wires for Transmitting and Distributing Electrical Energy for Commercial and Industrial Purposes.

*Be it enacted and ordained by the Executive Council of Porto Rico:*

Section 1. That the Porto Rico Power & Light Company, its successors and assigns, are hereby authorized, for the purpose of developing the water power of La Plata river at the location known as "Comerio falls," to build a dam across the river and upon the land of the abutting owners,

Arpin v. Porto Rico Power & L. Co.

with all necessary rights of flowage; to lay and maintain a canal or line of pipe to convey the waters to a power station; to estaablish proper reservoirs for the holding and storage of the waters of said river; to regulate the flow of the water thereof above the dam; to diminish or cut off entirely the flow of water between the said dam and the place of discharge of said water in said power station, returning the water to the river after passing the power station, without contamination, and to construct, with the approval of the commissioner of the interior, such other works as may be necessary to generate, convert, and distribute for profit the electricity as aforesaid.

Section 2. The route of the said transmission line shall be approximately as follows: From the water power station of the La Plata river below Comerio falls in the most direct line practicable to the town of Bayamon; thence from the town of Bayamon in the most direct line practicable to Martin Peña; thence to the city of San Juan; and thence to a distributing station; or by a direct line from Bayamon to the city of San Juan to such distributing station, with branches and distribution lines within the municipalities of Manati, Vega Baja, Toa Alta, Barranquitas, Aibonito, Coamo, Santa Ysabel, and all municipalities to the east thereof, subject always, however, to the provisions of § 4 of this franchise.

An accurate survey of the route of the transmission lines shall be submitted by the grantee, through the commissioner of the interior, for the approval of the executive council, within two months from the date of the acceptance of this ordinance by the grantee, as hereinafter provided.

Section 3. The said Porto Rico Power & Light Company, its successors and assigns, are hereby authorized to enter upon and occupy private and public lands or property for the purpose of making surveys, determining the route of the lines, or performing other necessary acts; and the said Porto Rico Power & Light Company, its successors and assigns, shall have the power to acquire by purchase or under the laws of eminent domain, such private lands or easements over the same as may be necessary for the flowage and storage of the water and the development and distribution of electrical energy generated thereby, as now determined or as hereafter may be provided by law, applicable to such cases.

Section 4. All plans shall be submitted to and approved by the commissioner of the interior, and the material furnished and construction shall be at all times subject to the inspection of said commissioner or his authorized agents for the purpose of securing compliance with such plans.

Said Porto Rico Power & Light Company, its successors and assigns, shall make changes in or modifications of the plans or work only after such changes and modifications have been approved by the said commissioner of the interior; but the construction, operation, and maintenance of the system herein authorized shall not begin until the approval of the commissioner of the interior is first obtained. And if any part of such

system shall thereafter become an obstruction or injury to the public interests, in the opinion of the commissioner of the interior, he may, with the approval of the executive council, and upon reasonable notice to the grantee, direct the alteration or removal of the part of said system so obstructing or injuring the public interests.

Section 5. The work of installation shall be begun within ninety days after the signing of this franchise by the governor of Porto Rico, and the work shall be finished and the system in operation between the power house at Comerio falls and San Juan within two years from the date of the acceptance of this franchise by the grantee.

Section 6. This franchise shall be accepted in writing, filed with the executive council within thirty days after the signing thereof by the governor of Porto Rico, and upon said acceptance the Porto Rico Power & Light Company, its successors or assigns, shall deposit with the treasurer of Porto Rico fifteen thousand ($15,000) dollars in cash or approved evidences of credit as a guarantee of the completion of the work, and said deposit is hereby stipulated to be liquidated damages which shall accrue to and become the property of the people of Porto Rico, without the necessity of judicial proceedings, if the required work is not completed within the period herein provided.

Upon the presentation to the treasurer of Porto Rico of a certificate from the commissioner of the interior certifying to the completion of said work, as provided in § 5 of this ordinance, within the period herein stipulated, or before, the said treasurer is authorized and directed to return to said Porto Rico Power & Light Company, its successors or assigns, the security above mentioned.

Section 7. The said Porto Rico Power & Light Company, its successors or assigns, agree to supply the electric current at reduced rates of tariff, which shall never exceed the following maximum schedule:

For lighting; in the municipality of San Juan, 10c. per K. W. H.

In places outside of the municipality of San Juan, 15c. per K. W. H.

For power:

| | |
|---|---|
| Up to 10 H. P., | 10c. K. W. H. |
| 11 to 20 H. P., | 10% discount. |
| 21 to 40 H. P., | 15% ” |
| 41 to 100 H. P., | 20% ” |
| 101 and over, | 25% ” |

Section 8. The system hereby authorized shall be deemed to be a public service system, and such service shall be furnished to the public on demand on equal terms to all without discrimination, and its charges and service shall be at all times subject to effective regulation by the government through the executive council.

Section 9. The right is reserved to the insular government of Porto

Arpin v. Porto Rico Power & L. Co.

Rico to 260 cubit feet of water per minute from said La Plata river, to be taken from any point above the dam.

Section 10. The Porto Rico Power & Light Company, its successors and assigns, shall keep in reserve a steam plant, with capacity sufficient at all times to properly light the streets of the municipality of San Juan. Said steam plant shall be open to inspection by the commissioner of the interior at all times, and he shall have the right from time to time to require the grantee to test the same to see that the provisions of this section are complied with.

Section 11. In the event that said Porto Rico Power & Light Company shall assign this franchise to any company, corporation, individual, or individuals, said company, corporation, individual, or individuals shall, by such assignment, succeed to and acquire all the rights, liberties, privileges, power, and authority herein conferred upon the said Porto Rico Power & Light Company, and shall also be obligated to all the terms and conditions herein stipulated.

Section 12. In accordance with § 3 of the joint resolution of Congress, approved May 1, 1900, the franchise herein granted shall be subject to amendment, alteration, or repeal; no stock or bonds shall be issued except in exchange for actual cash or property at a fair valuation, equal in amount to the par value of the stock or bonds issued; no stock or bond dividends shall be issued; the property constructed and acquired hereunder may be purchased or taken by the public authorities at a fair and reasonable valuation, and the executive council shall regulate the charges and conditions of service hereunder.

Section 14. This franchise is granted for the period of ninety-nine (99) years from the date of its approval by the governor of Porto Rico.

Section 15. The granting of this franchise by the executive council of Porto Rico shall not be deemed in any sense a recognition of any right or claim made by Ramón Valdés, or any company or corporation, to any previous grant or concession of the water power of Comerio falls.

Done in open session of the executive council of Porto Rico this.......... day of.............. A. D. 1906.

.........................................
President of the executive council.

Approved this .................day of ................... A. D. 1906.

.........................................
Governor of Porto Rico.

Arpin v. Porto Rico Power & L. Co.

## THE PEOPLE OF PORTO RICO.

OFFICE OF THE SECRETARY.

I, ........................................., secretary of Porto Rico, do hereby certify that the foregoing six printed pages are a true copy of an ordinance entitled "A Franchise Granting to the Porto Rico Power & Light Company, Its Successors and Assigns, the Right to Develop the Water Power Known as 'Comerio Falls,' Situated on La Plata River, for the Generation of Electrical Energy, and to Build, Construct, Erect, and Maintain Lines of Wires for Transmitting and Distributing Electrical Energy for Commercial and Industrial Purposes," as the said ordinance appears upon the official record in my custody of the proceedings of the executive council of Porto Rico, at a meeting held on the ............ day of ................ A. D. 1906. I further certify that the said ordinance was duly approved by the governor of Porto Rico on the ........... day of ................ A. D. 1906, as appears by the official records in this office.

In witness whereof, I have hereunto set my hand and the great seal of Porto Rico, at the capital, on this ................ day of ............. in the year of our Lord nineteen hundred and ................., and of the independence of the United States the one hundred and..............

........................................
Secretary of Porto Rico.